

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-19-00083-CR

---

SAMANTHA NICOLE WOHLFORD, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 276th District Court
Titus County, Texas
Trial Court No. CR19088

---

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Burgess

## MEMORANDUM OPINION

Ernest Lee Ibarra, Jr., was beaten, abducted from his home, and murdered by three men during the early morning hours of February 20, 2015. Investigation of the incident resulted in charges of aggravated kidnapping[1] against Ibarra's wife, Samantha Nicole Wohlford, who was convicted by a Titus County jury and sentenced to fifty years' imprisonment. On appeal, Wohlford complains that the trial court erred in failing to instruct the jury that Jonathan Sanford, one of the three men involved in Ibarra's kidnapping and murder,[2] was an accomplice witness as a matter of law and in failing to include a jailhouse-witness instruction in its jury charge. Because we find that (1) the trial court did not err by not including a jailhouse-witness instruction and (2) the trial court's error in failing to give a proper accomplice-witness instruction was harmless, we affirm the trial court's judgment.

## I.    No Jailhouse-Witness Instruction Was Required

In her second issue, Wohlford asserts that the trial court erred in failing to give a jailhouse-witness instruction. Wohlford argues that Whitney Smith, who was incarcerated in a federal prison at the time of trial, was a jailhouse witness and that the trial court was required to include a jailhouse-witness instruction in its charge under Article 38.075 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.075(a). We disagree.

Section 38.075(a) provides, in relevant part:

A defendant may not be convicted of an offense on the testimony of a person to whom the defendant made a statement against the defendant's interest during a time

---

[1]TEX. PENAL CODE ANN. § 20.04(b).

[2]The three men were Sanford, Sanford's brother-in-law, Jose Ponse, and Sanford's friend, Octavious Rhymes.

> when the person was imprisoned or confined in the same correctional facility as the defendant unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed.

*Id.* Testimony from a jailhouse witness "is inherently unreliable due to the inmate's incentive to better [her] circumstances." *Phillips v. State*, 463 S.W.3d 59, 66 (Tex. Crim. App. 2015). Consequently, "Article 38.075 was enacted in recognition that incarcerated individuals have an incentive to provide information against other incarcerated individuals and that this testimony should be corroborated." *Id*.

Since a trial court is required to sua sponte instruct the jury on the "law applicable to the case," it is error for the trial court not to include a jailhouse-witness instruction when the requirements of Article 38.075 are met. *Id*. at 65 (quoting *Oursbourn v. State*, 259 S.W.3d 159, 180 (Tex. Crim. App. 2008). However, a trial court is only required to give a jailhouse-witness instruction when the record shows that the requirements of Article 38.075 have been met. *See Oursbourn v. State*, 259 S.W.3d 159, 180 (Tex. Crim. App. 2008) ("If the evidence raises [the] issue . . . , then the trial court shall instruct the jury [whatever the statute or rule requires].").

Under the plain language of Article 38.075, a jailhouse-witness instruction is only required when (1) there is testimony of a person, (2) to whom the defendant made a statement against the defendant's interest, (3) during a time when the person was imprisoned or confined in the same correctional facility as the defendant. *See* TEX. CODE CRIM. PROC. ANN. art. 38.075(a). In this case, Smith testified that Wohlford told her that she had sent a text to one of the men who had

3

abducted her husband to get rid of her husband's cell phone and that she had deleted the text.[3] In the context of the evidence at trial, this statement was against Wohlford's interest. Thus, the first two requirements of Article 38.075 were met.

However, there was no evidence in the record of when or where these statements were made to Smith by Wohlford.[4] As Wohlford candidly concedes in her brief, "[i]t is not clear from the trial record when, where, and the circumstances of" Wohlford's statements to Smith. The record only shows that Smith was incarcerated in a federal prison at the time of trial, that Wohlford was not incarcerated in a federal prison, that Smith had had some contact with Wohlford, and that Wohlford had made the statements to Smith. Thus, there was no evidence in the record that Wohlford made the statement to Smith "during a time when [Smith] was imprisoned or confined in the same correctional facility as [Wohlford]." *Id.*

Consequently, the record does not show that the requirements of Article 38.075 were met, the jailhouse-witness issue was not raised, and the trial court was not required to include a jailhouse-witness instruction in its jury charge. We find that the trial court did not err in not including a jailhouse-witness instruction. Therefore, we overrule Wohlford's second issue.

---

[3]Other evidence in the case showed that two texts had been sent from Wohlford's cell phone to the cell phone owned by Octavious Rhymes, one of the men involved in the abduction and murder, at a time shortly after the abduction when law enforcement was pinging Ibarra's cell phone in an attempt to locate him and the perpetrators.

[4]Although the State attempts to bring forth additional evidence in its brief, the parties' briefs are not a part of the appellate record. In analyzing whether the trial court was required to include a jailhouse-witness instruction, we are limited to whether the evidence in the record at the time of the charge raised the issue. *See Oursbourn*, 259 S.W.3d at 180.

## II.     The Trial Court's Error in Failing to Give a Proper Accomplice-Witness Instruction Was Harmless

### A.     Introduction

Wohlford also complains that the trial court erred in failing to give a proper accomplice-witness instruction.[5]  Wohlford argues that Sanford, who had previously been convicted of the aggravated kidnapping and murder of Ibarra, was an accomplice as a matter of law and that the trial court reversibly erred in failing to instruct the jury that Sanford was an accomplice as a matter of law.  The State concedes that the trial court erred, but argues that such error was harmless.  We agree with the State.

### B.     Standard of Review

We review an alleged error related to an accomplice-witness instruction under the procedural framework of *Almanza*.[6]  *Zamora v. State*, 411 S.W.3d 504, 512 (Tex. Crim. App. 2013) (citing *Casanova v. State*, 383 S.W.3d 530, 533 (Tex. Crim. App. 2012); *Herron v. State*, 86 S.W.3d 621, 631–32 (Tex. Crim. App. 2002); *Medina v. State*, 7 S.W.3d 633, 642 (Tex. Crim. App. 1999)).  Under this framework, we employ a two-step process in our review of the alleged error.  *See Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994).  "Initially, we determine whether error occurred and then evaluate whether sufficient harm resulted from the error to require reversal."  *Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.) (citing *Abdnor*, 871 S.W.2d at 731–32).  In examining the charge for possible error, appellate courts "must

---

[5]Wohlford did not object or request additional instructions to the jury charge at trial.

[6]*Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g).

5

examine the charge as a whole instead of a series of isolated and unrelated statements." *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012) (quoting *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995)). Only if we find error do we analyze that error for harm. *See Abnor*, 871 S.W.2d at 731.

**C. Analysis**

**1. The Trial Court Erred in Failing to Give a Proper Accomplice-Witness Instruction**

Sanford participated in and was convicted of the aggravated kidnapping and murder of Ibarra. Therefore, he was an accomplice as a matter of law. *See Hall v. State*, 161 S.W.3d 142, 149 (Tex. App.—Texarkana 2005, pet. ref'd). "If a witness is an accomplice as a matter of law, the trial court is required to provide an accomplice-witness instruction to the jury." *Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006). The instruction must explain the definition of an accomplice and inform the jury that the witness is an accomplice as a matter of law. *Zamora*, 411 S.W.3d at 510. It must also instruct the jury regarding the requirements of Article 38.14. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14; *Zamora*, 411 S.W.3d at 510.

If a State witness is an accomplice as a matter of law, the trial court has a duty to instruct the jury accordingly, and the failure to do so is error. *Herron v. State*, 86 S.W.3d 621, 631 (Tex. Crim. App. 2002). In this case, although the trial court instructed the jury regarding the requirements of Article 38.14, it failed to include the definition of an accomplice and to identify Sanford as an accomplice as a matter of law. Therefore, we find that the trial court erred in failing to give a proper accomplice-witness instruction.

6

## 2.     The Trial Court's Error Was Harmless

Having found error, we must determine whether Wohlford was harmed by the trial court's omission.  "Where the evidence clearly shows a witness is an accomplice as a matter of law, the trial court must so instruct the jury, but if the appellant fails to object to the omission of the instruction, as in [Wohlford's] case, he or she must prove egregious harm to prevail on appeal." *Hall*, 161 S.W.3d at 149.  Article 38.14 provides, "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."  TEX. CODE CRIM. PROC. ANN. art. 38.14.

The purpose of this instruction is to inform "the jury that it cannot use the accomplice witness testimony unless there is also some non-accomplice witness testimony connecting the defendant to the offense."  *Herron*, 86 S.W.3d at 632.  Generally, in an egregious harm analysis, "non-accomplice evidence can render harmless a failure to submit an accomplice witness instruction by fulfilling the purpose an accomplice witness instruction is designed to serve."  *Id.* However, there may be harm if "the corroborating (nonaccomplice) evidence is 'so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive.'" *Hall*, 161 S.W.3d at 150 (quoting *Herron*, 86 S.W.3d at 632).

To evaluate the sufficiency of corroboration evidence, we eliminate the accomplice-witness testimony from consideration and examine the nonaccomplice evidence "to ascertain if there is evidence which tends to connect the accused with the commission of the offense." *Hernandez v. State*, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997) (citing *Reed v. State*, 744 S.W.2d

7

112, 125 (Tex. Crim. App. 1988)); *Burks v. State*, 876 S.W.2d 877, 887 (Tex. Crim. App. 1994); *Hall*, 161 S.W.3d at 150. The nonaccomplice evidence need not establish guilt beyond a reasonable doubt or directly link the defendant to the crime. *Hernandez*, 939 S.W.2d at 176; *Gill*, 873 S.W.2d at 48. Rather, "[t]he accomplice witness rule is satisfied if there is *some* non-accomplice evidence which *tends* to connect the accused to the commission of the offense alleged in the indictment." *Hernandez*, 939 S.W.2d at 176 (citing *Gill*, 873 S.W.2d at 48 (citing *Gosch v. State*, 829 S.W.2d 775, 777 (Tex. Crim. App. 1991); *Cox v. State*, 830 S.W.2d 609, 611 (Tex. Crim. App. 1992))). Evidence placing the defendant "in the company of the accomplice at or near the time or place of the offense is proper corroborating evidence." *McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997) (citing *Cockrum v. State*, 758 S.W.2d 577, 581 (Tex. Crim. App. 1988); *Burks*, 876 S.W.2d at 887–88). Further, "[i]n determining the strength of the particular item of nonaccomplice evidence, we must examine (1) its reliability or believability, and (2) the strength of its tendency to connect the defendant to the crime." *Hall*, 161 S.W.3d at 150 (citing *Herron*, 86 S.W.3d at 632).

### a. Sanford's Testimony

At trial, the State relied on Sanford's testimony for the details of his relationship with Wohlford and the kidnapping and murder of Ibarra. Sanford testified that he met Wohlford on February 14, 2015, through his girlfriend, Sharla, who took him to Wohlford's house. A few days later, Sharla went to the hospital for a Caesarian-section, and Wohlford came to visit her several times. During Wohlford's visits, Sanford borrowed Wohlford's vehicle to pick up her children, and he drove her vehicle other times with her permission. While Sharla was in the hospital,

Wohlford complained to Sanford about Ibarra calling all the time and being abusive. When Sanford told her that he and Rhymes could take Ibarra out of the picture, she asked how that would be done.

They originally planned to set up Ibarra by planting methamphetamine in his vehicle. In furtherance of that plan, Sanford, Rhymes, Wohlford, and her children drove Wohlford's vehicle to Mount Vernon to purchase methamphetamine from Rhymes' cousin. They completed the purchase around 7:00 p.m. on February 19 and returned to Rhymes' house in Pittsburg, where Ponse was cooking enchiladas. Sometime during the evening, Sanford and Ponse changed the plan, and Sanford asked Wohlford what she thought about her husband dying. When she asked if he was serious, Sanford replied that all she had to do was leave the front door unlocked.

Sanford and Rhymes took Wohlford and her children to her house about 12:00 midnight, removed the children's car seats from her vehicle, and took the vehicle to Wal-Mart to purchase gloves. They then picked up Ponse and smoked the methamphetamine on the way back to Wohlford's house. When they arrived at the house, the front door was unlocked, and the men proceeded upstairs to Wohlford and Ibarra's bedroom where Rhymes got Wohlford out of bed and Sanford and Ponse began beating and pistol-whipping Ibarra.

After Ibarra was beaten into submission, they took him downstairs, where Rhymes and Wohlford had already gone. After further beating Ibarra, Sanford and Ponse took him outside, searched his truck, and found two cell phones, which they took with them. Rhymes took Wohlford back upstairs, where he apparently bound her hands, feet, and mouth. In order to give the

9

appearance of a forced entry, Sanford kicked in the front door. Sanford then detailed how they took Ibarra to a remote location, where he was shot in the back of the head.

### b. The Nonaccomplice Evidence

Bret Webster, the boyfriend of Wohlford's aunt, testified that he received a call from Wohlford's mother at 12:30 a.m. on February 20, who asked him to go to Wohlford's house because something was happening. On the way there, he learned that Ibarra had been kidnapped and that Wohlford was tied up. He also testified that Wohlford's children stayed with him two nights before the kidnapping and murder. The next morning, Wohlford sent a text message to him that a man named Johnathan would be picking the children up in her vehicle, which he did.

Ginger Kesterson, Wohlford's aunt, testified that she was the first person to reach the house after the kidnapping. She found Wohlford upstairs with her mouth and feet tied, and her hands were tied behind her back. She checked on the children, who were all asleep in one room. She found that strange since they usually fell asleep all over the house. She untied Wohlford and said that all of the bindings were tight. Kesterson asked Wohlford how she called her mother, and Wohlford said she used her face. When she asked her where her vehicle was, Wohlford told her it was not supposed to be there.

Kesterson also testified that Wohlford often told her that she was sick of her husband. Stephen Patterson, who had known Wohlford for twenty years, testified that Wohlford complained to him that Ibarra was beating and abusing her, but that he never saw any marks evidencing that claim. Wohlford asked Patterson to take care of it, which he interpreted to mean she wanted him to beat Ibarra up.

10

Lacona Slaton, Ponse's girlfriend, testified that she met Wohlford at the hospital the day before Ibarra was murdered. Sanford, Rhymes, Ponse, and Wohlford's children were also at the hospital at the time. Sanford, Rhymes, Ponse, Slaton, and Wohlford's children all went to Wal-Mart so Wohlford could visit Sharla. After leaving Wal-Mart, Sanford dropped Ponse and Slaton off at Rhymes' house, returned to the hospital to get Wohlford, and brought her to Rhymes' house. During that evening, there were times when Sanford, Rhymes, Ponse, and Wohlford would leave the room and whisper so she could not hear them. At one point, Sanford asked Wohlford about her kids, and Wohlford said she could give them something to put them to sleep fast. Wohlford also stated that she wanted something done and that she was going to get it done regardless. Later, Sanford and Rhymes took Wohlford and her children to her house.

Chris Durant, a deputy with the Titus County Sheriff's Office (TCSO), responded to the kidnapping call. Among other things, he testified that he learned the perpetrators had taken Ibarra's cell phone. After he obtained the number, he gave it to their communications officer so they could have it "pinged" to determine its physical location. He testified that Wohlford was in the general area when he talked with the communications officer. Wohlford then asked if she could call her mother. Around 3:17 a.m., Durant learned that law enforcement had located the cell phone, and Durant told Wohlford of that development.

Cell phone records were introduced showing text messages from Wohlford's cell phone to Rhymes' cell phone sent at 2:31 a.m. and at 3:18 a.m. on February 20. The first message said, "Kill [Ibarra's] phone. Shut that s—t down." The second message said, "Ditch phone. Move." When Wohlford's cell phone was examined later that morning, no text message to Rhymes was

11

found. However, Smith testified that Wohlford admitted to her that she had sent a text message to one of the men to get rid of her husband's cell phone and then deleted it. At trial, Wohlford did not deny that she had sent the text messages to Rhymes and did not deny that she deleted them. Rather, she testified that she did not recall doing either of those things.

Chris Bragg, an investigator for the TCSO, testified that he interviewed Wohlford both at her residence and at the sheriff's office. He stated that Wohlford continually maintained that she did not know who broke in and abducted Ibarra. Around 9:00 a.m., she began to divulge who the men were, but only after she asked the sheriff if it would implicate her as an accomplice if she knew who they were and had waited so many hours to tell them. Wohlford then identified Sanford, Rhymes, and Ponse as the perpetrators. She also disclosed that she had met Sanford and Ponse at the hospital when Sharla was having a baby and that they discussed them coming to her house and removing Ibarra.

Eliminating Sanford's testimony and only considering the nonaccomplice evidence, we find that there was some evidence that tends to connect Wohlford to the commission of the offense. Testimony from an uninterested witness places Wohlford in the company of Sanford, Rhymes, and Ponse for a significant portion of the day and evening before Ibarra's kidnapping and murder. In addition, this testimony shows that while in their presence, Wohlford discussed the removal of Ibarra, agreed to assist the perpetrators by ensuring that her children were out of the way and fast asleep, and agreed to allow them to use her vehicle. Further, evidence showed that Wohlford shared critical information with Rhymes during the investigation via text messages in order to aid them in avoiding capture and that she deleted the messages in an apparent attempt to hide her

12

involvement. Finally, although Wohlford knew the identities of Ibarra's kidnappers, she kept that information from law enforcement for hours before finally disclosing it. The remainder of this evidence is reliable and clearly shows Wohlford's active involvement in the aggravated kidnapping.

Since some evidence tends to connect Wohlford to the commission of the aggravated kidnapping, the purpose of a proper accomplice-witness instruction was fulfilled. Therefore, we find that the error by the trial court was harmless. *See Herron*, 86 S.W.3d at 632. We overrule Wohlford's first issue.

For the reasons stated, we affirm the trial court's judgment.


                                        Ralph K. Burgess
                                        Justice


Date Submitted:      September 13, 2019
Date Decided:        September 25, 2019

Do Not Publish