

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-12-00096-CR

MATTHEW RYAN WILSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 6th District Court
Lamar County, Texas
Trial Court No. 24585

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

## O P I N I O N

A jury convicted Matthew Ryan Wilson of aggravated assault of his father, Terry Joe Wilson, with a deadly weapon, and he was sentenced to ten years' imprisonment. Wilson raises two points on appeal. He first argues that the evidence against him was legally insufficient to support his conviction. In his second point, Wilson complains of the trial court's action in having responded to a note from the jury by informing the jury of the range of potential punishment of a lesser included offense during the guilt/innocence phase of the trial. We affirm the trial court's judgment.

## I.      Facts of the Case

Wilson's grandmother, Joyce Marie Wilson, testified that Wilson appeared at her home on October 18 and seemed "very agitated." "He sat in the rocking chair and he rocked and he rocked" while telling his grandmother that she had lied to him. The grandmother was perplexed because she "didn't know what [she] had lied to him about." Then Wilson, who lived with his father, Terry Joe Wilson (the assault victim), rose and began to walk home.

Terry provided Wilson's food and shelter as he had his entire life, primarily because Wilson had difficulty maintaining employment due to his volatility. Shortly before Wilson returned to Terry's home, Terry returned home from work to find "the back door standing wide open" and the oven turned on and he saw Wilson approaching as he was walking back from Joyce's home. The two men met outside the home and Terry began questioning Wilson about errands Terry had asked Wilson to run when Wilson "just started rambling and getting very irritated as I was talking to him. The more I -- anything I asked him, he just kept getting more

2

agitated. So I tried to keep a calm voice. So he just -- then it came to cusswords and stuff like that." Terry described "a wild look in [Wilson's] eye" and said that Wilson "gritted his teeth, you know, working his self [sic] up to be aggressive towards me."

The cursing six-foot four-inch tall and 185-pound Wilson then "said something very demeaning towards [Terry] like you're a queer or something," and threatened to "knock the shit out of" him. Terry recalled, "Then [Wilson] just -- he doubled up his fist and he came towards me. I took -- he was very -- he was on me in less than a second. He hit me in the back and then he caught me again in the side of the head. When he hit me there it stunned me." Terry was "hurt" and testified, "[A]s soon as I regained enough sense, I figured I needed to put some distance in between -- he was right there. So I pushed [Wilson] backwards . . . [and] caught him somewhere around the face."

Wilson retaliated to the shove by grabbing up an eight-pound sledgehammer and walking toward Terry. Terry "had already took off and . . . had eight steps on him, maybe ten." He estimated that Wilson took six steps toward Terry as Terry was saying "do not do this, do not do this," before Wilson tossed the sledgehammer to the ground and "walked up the road towards the highway." Terry testified he was afraid that Wilson might hurt him with the sledgehammer and that he already "had a pretty good hen-sized knot on [his] head." He later "noticed there was an empty fifth whiskey bottle by [Wilson's] bed."

After wandering about, Wilson decided to visit Joyce's home again. Joyce also stated that Wilson "had a wild look in his eyes," "was agitated," "frightening," "and he was not . . . himself." Joyce secretly called Terry to inform him of Wilson's arrival, prompting Terry

3

to meet them. Wilson "looked at [Terry] and [asked], you want me to do the same thing to you again[?]" Fearing for his parents' safety, Terry dialed 9-1-1. Wilson heard the dispatcher's voice, cursed, muttered to Terry "you called the law on me," and "took off out the door" "like a streak of lightening." Deputy Chad Frazier responded to the call at approximately 8:23 p.m. He located and arrested Wilson at 11:50 p.m.

Because of his conduct over time, Joyce believed Wilson to be bipolar. She had paid for him to see a psychiatrist, but Wilson did not complete his course of treatment and did not take the medication he was prescribed. Terry explained, "[Wilson] gets very emotional real quick, loses his temper, stuff like that." He recalled an incident where Wilson had punched Joyce "in the side," and had "grabbed my dad's arm, [saying] something about breaking it." Terry believed that Wilson had been affected by emotional problems for "[a]t least three or four years."

## II. Legally Sufficient Evidence Supported Wilson's Conviction

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found the essential elements of aggravated assault with a deadly weapon beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917 (Cochran, J. concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to

4

weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* Wilson committed the offense of aggravated assault if he intentionally or knowingly threatened another with imminent bodily injury and used or exhibited a deadly weapon during the commission of the assault. TEX. PENAL CODE ANN. §§ 22.01(a)(2), 22.02(a)(2) (West 2011).[1]

First, Wilson contends that the evidence was legally insufficient to demonstrate that he possessed the requisite mens rea element of the offense. "The gist of an assault offense is that the defendant 'acts with intent to cause a reasonable apprehension of imminent bodily injury.'" *Fagan v. State*, 362 S.W.3d 796, 798 (Tex. App.—Texarkana 2012, pet. ref'd) (quoting *Dobbins v. State*, 228 S.W.3d 761, 766 (Tex. App.—Houston [14th Dist.] 2007, pet. dism'd)). Therefore, we look to the "acts and culpability of the defendant's behavior, that is, whether the defendant intended to cause or knowingly 'caused in the victim a reasonable apprehension of imminent bodily injury.'" *Id.* at 798–99 (quoting *In re S.B.*, 117 S.W.3d 443, 450 (Tex. App.—Fort Worth

---

[1]The State's indictment alleged that Wilson "intentionally or knowingly threaten[ed] imminent bodily injury to Terry Wilson and . . . use[d] or exhibit[ed] a deadly weapon during the commission of the assault, to-wit: a hammer."

2003, no pet.)); *Edwards v. State*, 57 S.W.3d 677, 680 (Tex. App.—Beaumont 2001, pet. ref'd); *see Tidwell v. State*, 187 S.W.3d 771, 774 (Tex. App.—Texarkana 2006, pet. struck).

Here, Wilson cursed Terry, "gritted his teeth," and verbally threatened to "knock the shit out of" him. Wilson then doubled up his fist, striking Terry on the back and head with such force that it "hurt" and "stunned" Terry. Still in an agitated state, Wilson grabbed a sledgehammer and began walking toward Terry. Based on these acts, which "are generally reliable circumstantial evidence of one's intent," we conclude that the jury could reasonably infer that Wilson intended to cause a reasonable apprehension of imminent bodily injury in Terry. *Laster v. State*, 275 S.W.3d 512, 524 (Tex. Crim. App. 2009).

Wilson argues that he never swung the sledgehammer and that he was eight to ten steps away from his father. He claims that because he "did nothing with the sledgehammer but drop it and walk off[,] . . . [n]o bodily injury was on the verge of occurring." This argument ignores the verbal threat issued to Terry and the steps that were taken by Wilson toward Terry as he was carrying the sledgehammer, proceeding closer to his father. In fact, Wilson's demeanor caused Terry to beg Wilson "not [to] do this." Moreover, bodily injury occurred when Wilson struck Terry, and the evidence was legally sufficient if Wilson exhibited a deadly weapon during the assault. TEX. PENAL CODE ANN. §§ 22.01(a)(2), 22.02(a)(2). The jury could look at the sequence of events as one continuing incident, not separating the physical blows from the threatened use of the sledgehammer. Exhibiting a deadly weapon means that the weapon was consciously shown or displayed during the commission of the offense. *Patterson v. State*, 769 S.W.2d 938, 941 (Tex. Crim. App. 1989). The threat of imminent bodily injury continued as an

6

aggressive Wilson approached Terry with the sledgehammer. *See Schmidt v. State*, 232 S.W.3d 66, 67 (Tex. Crim. App. 2007) ("In some cases, infliction of harm itself can be a threat of further harm."). Thus, the sledgehammer was exhibited during the assault.

Next, Wilson claims there is "no evidence supporting a 'reasonable apprehension of imminent bodily injury.'" However, "[t]he statute does not require actual perception of the threat by the victim," and "the question of whether a victim of assault by threat must perceive the threat has been left open by the Texas Court of Criminal Appeals." *Fagan*, 362 S.W.3d at 799 (citing TEX. PENAL CODE ANN. § 22.01(a)(2); *Olivas v. State*, 203 S.W.3d 341, 349 (Tex. Crim. App. 2006)). In any event, Terry, who had known of previous instances of Wilson's violence toward his own parents (Wilson's grandparents), testified that he was afraid of Wilson at that moment. Given that he had already been struck forcefully in the head and back by Wilson, a rational jury could conclude that Terry reasonably possessed a fear of imminent bodily injury.

It has been determined that a "perception of 'some threat of imminent bodily injury,' coupled with the use of a deadly weapon, supports a conviction for aggravated assault." *Id.* (citing *Olivas*, 203 S.W.3d at 350; *Dobbins*, 228 S.W.3d at 766). We now examine whether the sledgehammer was a deadly weapon.

A deadly weapon is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." TEX. PENAL CODE ANN. § 1.07(a)(17)(B) (West Supp.

7

2012).[2] Because the sledgehammer was not designed, made, or adapted for the purpose of inflicting bodily injury, it is not a deadly weapon per se. *In re S.B.*, 117 S.W.3d 443, 446 (Tex. App.—Fort Worth 2003, no pet.); *Charleston v. State*, 33 S.W.3d 96, 99 (Tex. App.—Texarkana 2000, pet. ref'd); *see McCain*, 22 S.W.3d at 502. In determining whether the sledgehammer could be classified as a deadly weapon, we employ the following five-factor test: (1) physical proximity between the victim and the object; (2) the threats or words used by the assailant; (3) the size and shape of the weapon; (4) the weapon's ability to inflict death or serious injury; and (5) the manner in which the defendant used the weapon. *Nash v. State*, 175 S.W.3d 427, 430 (Tex. App.—Texarkana 2005, pet. ref'd) (citing *Brown v. State*, 716 S.W.2d 939, 946–47 (Tex. Crim. App. 1986); *Tisdale v. State*, 686 S.W.2d 110, 115 (Tex. Crim. App. 1984) (op. on reh'g); *English v. State*, 647 S.W.2d 667, 669 (Tex. Crim. App. 1983); *Blain v. State*, 647 S.W.2d 293, 294 (Tex. Crim. App. 1983); *Williams v. State*, 575 S.W.2d 30, 32 (Tex. Crim. App. [Panel Op.] 1979)). No one factor is determinative, and each case must be examined on its own facts. Either expert testimony or lay testimony may be sufficient to support a finding. *English*, 647 S.W.2d at 668–69.

As explained above, Wilson exhibited the sledgehammer during the commission of the assault. However, Wilson posits that his distance from his father when possessing the

---

[2]In *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000), the court stated regarding Section 1.07(a)(17)(B):

> The provision's plain language does not require that the actor actually intend death or serious bodily injury; an object is a deadly weapon if the actor intends a use of the object in which it would be capable of causing death or serious bodily injury. The placement of the word "capable" in the provision enables the statute to cover conduct that threatens deadly force, even if the actor has no intention of actually using deadly force.

sledgehammer served to exculpate him from that part of the charge. The State argues that because Terry testified he "had eight steps on [Wilson], maybe ten," but Wilson took "approximately six steps towards Terry Wilson wielding that sledgehammer," "the physical proximity between the victim and the object was the equivalent of four steps." Viewing the evidence in a light most favorable to the verdict, the jury could reasonably have determined that the still-moving Wilson was sufficiently close to have threatened Terry with the use of the sledgehammer. The close physical proximity between Terry and the sledgehammer favors consideration of the sledgehammer as a deadly weapon, as does Wilson's verbal threat to Terry.

The size and shape of the weapon and its ability to inflict death or serious injury also contribute to the finding that it was a deadly weapon. Frazier retrieved the sledgehammer and testified that it weighed "around eight pounds" and was capable of causing serious bodily injury or death. Terry also espoused that the sledgehammer "would have probably broke something" if used by Wilson. The sledgehammer was also not something that was abstract in the eyes of the jury; it was present in the courtroom for the jury to view and evaluate as to whether it could be classified as a deadly weapon. In this case, we find that the jury could conclude that the sledgehammer constituted a deadly weapon.

We find the evidence legally sufficient to support Wilson's conviction for aggravated assault with a deadly weapon. His first point of error is overruled.

## III. The Trial Court's Instructions to the Jury Did Not Egregiously Harm Wilson

The trial court's charge to the jury included submissions on aggravated assault with a deadly weapon and the lesser included offense of assault causing bodily injury, family violence.

9

While the jury was deliberating on guilt/innocence, it sent out a note. The pertinent part of the note asked: "(1) If lesser offense is picked, is there still punishment? Same kind of punishment?" The trial court responded with a handwritten response: "Lesser included offense of assault causing bodily injury family violence is a Class A misdemeanor. Zero to 365 days in the county jail and/or a fine not to exceed $4,000. You are not to consider punishment at this time." Wilson argues that the trial court's response improperly allowed the jury to consider the punishment range of the lesser included offense during guilt/innocence.

Wilson points to Article 36.27, which provides the procedure by which a court is required to answer a jury's question. TEX. CODE CRIM. PROC. ANN. art. 36.27 (West 2006). Wilson states that "there is nothing in the record demonstrating that the jury note was even brought to the Appellant's counsel's attention. Therefore, the record is unclear as to whether he waived the error by failing to object." However, the appellant must present a record showing error requiring reversal. *Word v. State*, 206 S.W.3d 646, 651 (Tex. Crim. App. 2006). Thus, "when a record is silent, a presumption exists that the trial court complied with the requirements of article 36.27." *Moore v. State*, 278 S.W.3d 444, 452 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (citing *Word*, 206 S.W.3d at 649). Wilson "recognizes that it is presumed that the trial court complied with Art. 36.27," but urges this Court to consider the egregious harm analysis under *Almanza*,[3] which is applied to jury charge error.

---

[3]*Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g), *superseded on other grounds by rule as stated in Rodriguez v. State*, 758 S.W.2d 787 (Tex. Crim. App. 1988).

"When the trial judge responds substantively to a jury question during deliberations, that communication essentially amounts to an additional or supplemental jury instruction." *Daniell v. State*, 848 S.W.2d 145, 147 (Tex. Crim. App. 1993); *see Lucio v. State*, 353 S.W.3d 873, 875 (Tex. Crim. App. 2011).

Our review of jury charge error involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); *see also Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009). Initially, we determine whether error occurred and then evaluate whether sufficient harm resulted from the error to require reversal. *Abdnor*, 871 S.W.2d at 731–32. "[T]he inclusion of information regarding punishment in the charge at the guilt-innocence stage is improper." *Staggs v. State*, 503 S.W.2d 587, 588 (Tex. Crim. App. 1974); *see Jackson v. State*, 285 S.W.3d 181, 183–84 (Tex. App.—Texarkana 2009, no pet.). Thus, assuming preservation, the trial court's instruction advising the jury on the range of punishment with respect to the lesser included offense was erroneous.[4]

However, "the error is not such as to require reversal" because the prosecution has "the right to inform the prospective jurors about the range of punishment applicable in the case." *Staggs*, 503 S.W.2d at 588;[5] *see Moreno v. State*, 541 S.W.2d 170, 172 (Tex. Crim. App. 1976).[6]

---

[4]The record demonstrates that the range of punishment for the lesser offense was not previously discussed.

[5]*See Avery v. State*, No. 05-02-00735-CR, 2004 WL 78042, at *2 (Tex. App.—Dallas Jan. 20, 2004, pet. ref'd) (not designated for publication). Although this unpublished case has no precedential value, we may take guidance from it "as an aid in developing reasoning that may be employed." *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

[6]Egregious harm occurs where an error affects the very basis of a case, deprives the defendant of a valuable right, vitally affects a defensive theory, or makes the case for conviction or punishment clearly and significantly more persuasive. *Boones v. State*, 170 S.W.3d 653, 660 (Tex. App.—Texarkana 2005, no pet.) (citing *Saunders v. State*,

Further, the trial court specifically instructed the jury not to consider the range of punishment. We generally presume that the jury follows the trial court's instructions in the manner presented. *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009); *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005). The presumption is refutable, but the appellant must rebut the presumption by pointing to evidence that the jury failed to follow the trial court's instructions. *Thrift*, 176 S.W.3d at 224. This is because "the degree of harm demonstrated by an appellant must be actual, not merely theoretical." *Bradshaw v. State*, 244 S.W.3d 490, 497–98 (Tex. App.—Texarkana 2007, pet. ref'd). Here, no such showing has been made.

We overrule Wilson's final point of error.

## IV.     Conclusion

We affirm the trial court's judgment.


Bailey C. Moseley
Justice

Date Submitted:     December 10, 2012
Date Decided:       December 19, 2012

Publish

---

817 S.W.2d 688, 692 (Tex. Crim. App. 1991)). This is a difficult standard to prove, and it must be determined on a case-by-case basis. *Ellison v. State*, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002). The "actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S .W.2d at 171.