

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-20-00096-CR

LOGAN WESLEY, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 202nd District Court
Bowie County, Texas
Trial Court No. 19F1722-202

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Stevens

MEMORANDUM OPINION

Logan Wesley[1] was charged with sexually assaulting Sylvia Hanes, Jamie Cook, and Jane Parker when they were children.[2]  The charges related to all three victims were tried in a single, consolidated jury trial in Bowie County, Texas.[3]  In total, the jury found Wesley guilty of five counts of aggravated sexual assault of a child, nine counts of sexual assault of a child, and two counts of indecency with a child by contact.  The trial court sentenced Wesley to five life sentences and 220 years in prison, with the sentences to run consecutively.

Here, Wesley appeals from his seven convictions related to Sylvia Hanes:  three counts of aggravated sexual assault of a child under fourteen years of age, three counts of sexual assault of a child under the age of seventeen, and indecency with a child by contact. Wesley argues (1) that the trial court's failure to include a specific unanimity charge in the jury instructions was egregiously harmful and (2) that the judgments should be modified to reference the correct provisions of the Texas Penal Code.  Because we find that (1) the trial court's jury charge error did not result in egregious harm and (2) the judgments reflected the wrong provisions of the

[1]Other documents in the clerk's record refer to appellant as Logan Wesley, III, yet, the judgment only refers to Logan Wesley.  Nevertheless, appellant did not challenge his identity as the person named in the indictment at trial, and he does not challenge in this appeal whether he is the same person identified in the judgment.

[2]To protect the identity of any persons who were minors at the time of the alleged abuse, we refer to them by pseudonyms.  *See* TEX. R. APP. P. 9.10(a)(3).

[3]The convictions related to victim Hanes are on appeal under our cause number 06-20-00096-CR and include three counts of aggravated sexual assault of a child under fourteen, three counts of sexual assault of a child under seventeen, and one count of indecency with a child by contact.  The convictions related to victim Cook are on appeal under our cause number 06-20-00097-CR and include two counts of aggravated sexual assault of a child under fourteen and five counts of sexual assault of a child under seventeen.  The convictions related to victim Parker are on appeal under our cause number 06-20-00098-CR and include one count each of indecency with a child by contact and sexual assault of a child.

Texas Penal Code, we modify the trial court's judgments to reflect the proper provisions of the Texas Penal Code and affirm the judgments, as modified.

## I.      Factual and Procedural Background[4]

Wesley is Hanes's biological father.  Even so, Hanes lived with her aunt and uncle until she was thirteen years old.  During the summer of 1995, Hanes moved in with Wesley and her stepmother, Latisha, at Wesley's home on Phenie Street in Texarkana, Texas.  Hanes said that Latisha often left her alone with Wesley, but Wesley claimed that Latisha was home "all the time."

Hanes testified that Wesley started sexually abusing her shortly after she moved in.  Her bedroom had no door, and it was right next to Wesley's bedroom.  Her first memory of the abuse was waking up one night in the summer of 1995, feeling "a pain," because Wesley was touching her vagina with his penis, unsuccessfully trying to penetrate her.  She also remembered, on more than one occasion, waking up that summer to Wesley using his finger to penetrate her vagina. She agreed that Wesley "did penetrate [her] with his organ" and there was "a lot of rubbing and touching."  Sometimes, he would also touch her breasts.  The abuse happened when she was either asleep or trying to sleep.  While it was happening, "sometimes he would say, I love you."

The abuse continued after she turned fourteen.  Hanes testified that, after she turned fourteen, but prior to her turning seventeen, there were many occasions when he had sexual intercourse with her, penetrated her vagina with his fingers, and "contact[ed] [her] breast with his mouth."  He once penetrated her anus with his finger.  Sometimes Wesley performed different

---

[4]The factual and procedural background detailed in this opinion is also relevant to the companion appeals filed under our cause numbers 06-20-00097-CR and 06-20-00098-CR.

3

acts during the same incident, the events were "all the same[,] and a lot of [her memories of them] ran together."

After her "freshman year" of high school, when Hanes was "around 14," she moved in with her mother. Hanes eventually told her Mother that Wesley had raped her. Wesley, after he learned of Hanes's accusations, went to the house and yelled at Hanes, denied that he had done any such thing, and asked her why she would have said something like that. Trying to avoid the "drama" her accusations had caused, Hanes recanted to her mother. Her mother accused Hanes of lying about the abuse and kicked her out of the house. Hanes, who believed that she had "to go back" and live with Wesley, got into Wesley's truck, where he asked Hanes why she would tell her mother that and warned that he "could go to jail for that."

Wesley eventually married his second wife, Cynthia, and the three of them lived in the same house on Phenie Street with Cynthia's daughter, Priya. Hanes testified that, due to a lack of extra bedrooms, she and Priya slept in the same bed the "whole time [they] lived" there together. Hanes said that Wesley would enter her bedroom, put a pillow over Priya's head, and rape Hanes by penetrating her sexual organ with his sexual organ. Even though Priya denied it, Hanes testified that Priya was aware of Wesley raping her. Priya even told other people about it and once told Hanes that Wesley had "touched" her too when she was a teen.

When the family moved to a house on West 6th Street, Hanes, who was still younger than seventeen, found herself living there with Wesley, Cynthia, Priya, and Wesley's nephews, Darnell and Dimitri. Hanes testified that Wesley continued the abuse at that house and would come into her room "just about every night" and abuse her. As Hanes got older, she had

4

"outbursts" and shouted at Wesley, saying, "[L]et's talk about you and what you did. You've been raping me." On one such occasion, Wesley punched her, leaving Hanes with a swollen, black eye. Hanes testified that Wesley claimed she had hit him; she continued, "[E]verybody made me seem like I was crazy and like I was making it up."

The abuse continued into her early 20's, even after she moved into her own apartment. Wesley would come by her apartment and wait for her to retire for the evening. To avoid the abuse, Hanes tried to keep other people with her at her apartment. When she was alone, Hanes would sleep in her walk-in closet rather than her bed. Hanes testified that she made an outcry to her brother, and her brother told their mother. After speaking with Hanes again about the accusations, Mother moved in with her so Hanes would not have to be alone with Wesley when he came by her home. Hanes claimed that she did not report the abuse to the police because she did not want others to know, she loved Wesley, she did not want "anything to happen to him," and all she "ever wanted was just to have a normal . . . relationship" with Wesley.

Hanes moved away from Texarkana "around 2005." She met and married her husband "a few years after that." Eventually, Hanes told her husband what Wesley had done to her. Despite their history, Wesley, Cynthia, and the other children would come visit Hanes and her husband in Killeen, Texas, to celebrate Thanksgiving and Christmas. Even though seeing Wesley caused her great anxiety, Hanes missed him, and claimed that neither she nor her husband "held grudges like that."

Jane Parker was nine years old when she first met Wesley in 1996. She and her two brothers, Daniel and Chris, were walking down the street in Texarkana, Arkansas, heading for

her mother's place of work when Wesley stopped and gave them a ride in his vehicle. Wesley invited them to attend Trinity Temple Church of God in Christ, where he was the pastor, because it was across the street from where Parker's mother worked. Parker, her brothers, and her friends went there often for services, revivals, choir practice, and to help clean. Parker remembered seeing Hanes at the church "all the time."

Parker testified that, a few weeks after she started attending the church, Wesley called her into the pastor's office, separated her from the other children at the church at the time, and closed the door behind her. He grabbed her face so that her "lips would pucker" and he "forcefully" kissed her on the mouth. After the first instance, Wesley would either get her alone in the pastor's office or the playroom and kiss her and touch her breasts and butt with his hands, both over and under her clothing. Other times, when Wesley was driving different children home in the church van, Parker sometimes would be the last person dropped off. Wesley would drive her to Grady T. Wallace Park, near her stepfather's Texarkana, Texas, home and "grab [her] vagina from behind and [her] butt at the same time." Even though her brothers rode in the church van with her, they were always dropped off at her mother's house in Texarkana, Arkansas, and she went to her stepfather's house in Texarkana, Texas.

Parker recalled a specific instance when that happened when she was eleven years old. It occurred on the night of a revival service. Parker testified that it was very late at night. She was in "the white van," and she was the last one to be dropped off. But instead of dropping her off at home, Wesley drove her to the park, had her get out of the van, undressed her, and touched her breasts and put his fingers in her vagina. During the assault, Wesley's telephone rang, and

6

Parker could hear her stepfather's voice through the phone. Whatever was said, Wesley quickly "straightened" her clothes back up, got her back in the van, and took her home immediately. Parker testified that, during the short drive to her stepfather's house, Wesley "looked scared."

Parker explained that Wesley abused her "hundreds" of times, but she was afraid to tell anyone since, as the church pastor, he was trusted, he "controlled everything." Wesley also told Parker that she would go to hell if he left the church. She told others about the abuse, but no one believed her. Wesley apparently learned of Parker's accusations, and he showed up at her mother's house at "about one o'clock in the morning banging on the door." When the door was opened, he grabbed Parker and her mother, put them in a room, yelled at Parker, and asked her if he had ever "touched" her. Seeing that her mother did not do anything to stop Wesley, Parker shook her head "no" because she was afraid that Wesley was going to "jump on" her. Parker said she felt like she was all alone.

When Parker was twelve years old, she stood up to Wesley. She explained that Wesley "called [them] all in the [church] office to confront [them] about it." Although he stopped abusing her after that, she continued attending Wesley's church until she was seventeen years old because she was "afraid to leave."

During the years Parker attended Wesley's church, she also spent time at his house. Once, "around the holidays," she was at Wesley's house and saw Hanes and Wesley get into a heated argument. Hanes was "very upset" and yelled at Cynthia, "[Y]ou need to leave him; he's been raping me. I'm telling you, this isn't right." Parker testified that Wesley took Hanes into another room and "started beating her up." The next day at church, she saw that Hanes had a

black eye. Referencing the black eye, Wesley told the congregation that "no teenager [was] going to jump on him" and that is why he had beaten her, "because she's not going to run his house, and the congregation all amen'd."

Jamie Cook, thirty-four at the time of trial, testified that she was first introduced to Wesley in 1999, when she was thirteen years old. Her life was "in a crisis at that point"; her home life was "toxic," and she had no one else she could "lean on." Wesley was aware of her troubles. He came to her house and asked her mother if Cook could go to his church. Cook liked Wesley because he listened to her, treated her well, and eventually became her pastor and spiritual advisor. She was the only member of her household to regularly attend Wesley's church. Wesley picked Cook and other children up in the church van and, after church, would drop them back off at their homes. She remembered that, initially, the church van was blue, but later it was a "newer" white van, and there was also a silver van that "usually [Hanes] would drive."

Wesley once drove Cook to Parker's house as "some sort of a witness." He wanted Cook to say that "nothing was happening" with Parker—that Wesley was not abusing Parker. He essentially wanted Cook to "run interference" for him. Cook believed that happened before Wesley started abusing her, but she was not certain.

Cook testified that she was thirteen years old the first time Wesley did anything strange with her. After he dropped her off at her mother's house, Wesley went inside for a little while. As Wesley was leaving, he kissed her on the mouth. After that, his interactions with Cook quickly became overtly sexual in nature. One night after church, Wesley had "taken everybody

home" except for Cook, and he drove to the end of a dead-end street and had intercourse with her, penetrating her vagina with his penis. As he drove her back home, Wesley's car, identified by Cook as a white Dodge Intrepid, collided with another car at or near the intersection of South State Line and Euclid. After the accident, the other car drove away. Wesley attempted to chase the other car down, but it got away. Afterwards, Wesley dropped Cook off at her home.

Before and after Cook's fourteenth birthday, Wesley would take her to his place of work, Martin Resources in Nash, Bowie County, Texas, either in his car or in the church van. She testified that he would take her into the office and penetrate her mouth and vagina with his penis. It happened "about 15 to 20 times." Cook described the office's layout, and she remembered seeing a deer head on the wall of the boss's office.

Sometimes, she would be the last person dropped off after church, leaving her alone in the church van with Wesley. When that happened, she knew "what was about to happen." Once in the church van and once in his white Ford work truck, he drove her to the area around Wright Patman Lake where he would penetrate her mouth and vagina with his penis and touch her vagina with his mouth. Cook testified that similar abuse occurred when he took her to a hotel in New Boston, Texas, and again at a hotel in Clarksville, Texas. After the Clarksville encounter, she "started hemorrhaging from [her] vagina" because he was "really rough that day."

When Cook was about sixteen years old, she got a cell phone, and Wesley would encourage her to send messages to his work-issued pager telling him that she loved him. Wesley told her about problems in his marriage, that his wife was jealous of her, and that, when she became an adult, they would be together and have children.

9

Cook confirmed that, while she was older than thirteen, but younger than seventeen, Wesley penetrated her vagina with his fingers, had sexual intercourse with her, put his mouth on her vagina, had her put her mouth on his penis, and penetrated her anus with his penis. Different acts of abuse occurred in the same encounter, as Wesley's intercourse with her would be "oral, vaginal, rectal, but mostly oral and vaginal." He repeatedly told her that he loved her and that what they were doing was "okay because he was a man of God." She believed him and, at the time, believed herself to be in love with him.

When Cook was eighteen, she left home and moved into her own apartment. Wesley came over to her place "approximately 20 times." Although they continued to have a sexual relationship, she described it as "manipulation" rather than consensual. Cook testified that the relationship ended when she was eighteen or nineteen years old, when she told him that she did not want to see him anymore because she wanted a "normal life." Despite his professions of love for her, she was persistent, and the "relationship" ended.

After that, Cook had no contact with Wesley for several years, until 2018, when her uncle died, and she learned that Wesley would be performing the funeral service. That is when Cook decided to come forward and tell the police about the abuse. Cook reached out to Wesley's wife on Facebook, asking her to tell Wesley that Cook did not want Wesley to come to the service. Wesley's wife told her to show Wesley "grace" by not taking her allegations to the police because it could interfere with her "day care business" and her son's "record deal." Afterward, Cook reported Wesley's years of abuse to the Texarkana, Texas, Police Department.

Detective Tabitha Smith of the Texarkana, Texas, Police Department, a thirteen-year law enforcement veteran, was the lead detective in the case against Wesley. She testified that Cook was the first person to come forward with allegations against Wesley, followed by Parker and Hanes. Smith explained that the outcry of a victim of childhood sexual abuse is delayed "more often than not" and that, because of the delay, there is rarely any physical or DNA evidence related to the crimes.

Smith testified that evidence obtained during the investigation of this case confirmed many of the details of Cook's claims against Wesley. Smith confirmed that Wesley's wife runs a day care that is related to Wesley's church, that there is a deer head on the wall of the boss's office at Martin Resources, and that Martin Resources had issued Wesley a pager and a white Ford F-250 work truck. On August 10, 1999, at a time when Cook would have been only thirteen years' old, Wesley filed a police report claiming that his white Dodge Intrepid had been involved in a hit and run collision at the intersection of Euclid and South State Line Avenue. It was Smith's opinion that the dead-end road referenced by Cook was the dead end of Deloach Street in Texarkana, Texas, because the car accident occurred at a location between that dead-end street and Cook's home on Mary Street in Texarkana, Arkansas, where Wesley would have dropped off Cook. In 2019, after learning that someone else had come forward alleging that Wesley had touched or raped them, Parker and Hanes spoke with the police and reported their allegations against Wesley.

Missy Davison, a licensed professional counselor and program director at the Children's Advocacy Center, testified that it was common for an abused child to wait months or years to tell

11

anyone about the abuse because the abuser was almost always "someone that [the victim] kn[e]w, love[d], and trust[ed]," and "[t]hey [did not] want something to happen to them." She testified that it was very common for a victim to love the abuser and not want anything to happen to them for fear of losing a family member or a financial provider. For victims of chronic childhood sexual abuse, the abuse was a part of their regular life, so their memory of it would be fragmented. Davison also explained that, unless the abuse occurred near a special day or memorable event or the abuse was "something different," it was very unlikely that the victims would be able to provide the exact dates when the abuse occurred.[5]

During his case-in-chief, Wesley called several members of his family to testify. Priya testified that Wesley took her in when she was five or six years of age and that she saw him as her father. She denied that Wesley ever touched her inappropriately. Priya also claimed that she had no knowledge that Wesley had ever sexually abused anyone else. While growing up, she and Hanes shared a bed for several years. Priya described herself as a light sleeper, but she had no recollection of Wesley ever entering their bedroom, putting a pillow over her head, and sexually assaulting Hanes, as Hanes had claimed. Priya believed that Hanes made up those allegations because Wesley refused her frequent requests for money. She refused to give a statement during the police investigation of this case "because it [was] all lies."

Priya was aware that the police were in possession of a recorded conversation between Daniel and her. During the conversation, Priya said, "I know what he did; we all know what he did; why are you doing this," and "he's talking about killing himself. I know what he did; he

---

[5]Davison admitted that she had neither interviewed nor counseled any of the victims in this case.

12

knows what he did; he's asked forgiveness from [Hanes]; why are you doing this?" She did not deny making those statements. Priya claimed that, just because Wesley asked for forgiveness from her and Hanes does not mean he sexually abused them. She testified that Wesley was asking for forgiveness for hitting Hanes when she was sixteen and for cheating on her mother; "[t]hat's what it was about." However, on redirect, Priya said that she originally called Daniel because she had made online claims that Wesley was having sex with women from his church and because allegations that Wesley was having inappropriate sexual relations with children had "just hit the Internet."

Wesley's nephew, Darnell, testified that he moved into Wesley's house when he was eleven and that Wesley raised him like a son. He never saw Wesley "act inappropriately or in a sexual manner" toward any of his children. Darnell testified that he and Wesley's children were always the last ones in the van because they were being taken to Wesley's house, so there was "no way" that Parker or Cook were ever alone with Wesley in the church van.

Two of Wesley's daughters, Mia and Lonnie, testified that, although they did not live with Wesley, they never saw him behave in an "inappropriate sexual manner" with anyone when he came to visit them on weekends, summer vacation, and holidays. Lonnie testified that, when she and Mia were younger, they would both sleep in the same bed as Wesley, but "[n]othing ever happened." She continued, "He never touched us inappropriately at all."

Mikola Obisike testified that Wesley's wife was one of her cousins, that Wesley was the pastor of her hometown church, and that she had known him for fifteen years. She testified that the door to the pastor's office was always open and that it was a "welcoming environment." In

13

all of the years that she had known Wesley, she had never seen him behave or speak inappropriately around anyone. Her two daughters attended the daycare operated by Wesley's wife.

Wesley testified on his own behalf. He denied that he sexually assaulted or behaved inappropriately with Cook, Parker, or Hanes. He also denied ever using his position in the church to intimidate or threaten anyone to prevent them from reporting him to law enforcement authorities. Wesley testified that the church did not obtain the white church van until 2002 and, therefore, any claims by Cook or Parker that he abused them in that van prior to that were false. He claimed that neither Cook nor Parker were ever dropped off last because they were "always" dropped off at the same time as their respective siblings.

Wesley admitted that, while he was still married, he had a consensual sexual relationship with Cook, but he claimed that the relationship did not begin until after she was eighteen years' old, that he never told her he wanted to have children with her, and that the relationship lasted "maybe a year or so." Wesley testified that Cook's claims that she was thirteen when he had sex with her at Martin Resources could not be true because the deer head was not in the office until 2005 or 2006, several years after Cook claims to have been there. He also disputed Cook's account of the October 10, 1999, car accident, testifying that he was driving the church van at the time of the collision and that he, Cook, and the church's guitar player, Tracy, were in the van when the accident happened.

Wesley testified that Hanes lived with him for several years, but only for a few months at a time, as she would "bounce back and forth between" living at Wesley's house and living with

14

her mother. While he agreed that Hanes would have outbursts when she did not get her way, he denied that she ever accused him of sexually assaulting her. There were arguments at home because Hanes did not like to clean or do her share of the household chores. He admitted that Hanes and Priya did not get along well.

Wesley's testimony of the events surrounding Hanes's black eye differed from that of Hanes and Parker. Wesley testified that Parker was not present for the events that led to Hanes's black eye. On that night in 2003, when he and Hanes got into a heated argument over Hanes's refusal to wash the dishes, Wesley told her to pack her belongings because he was taking her to her mother's house. Hanes reacted by punching Wesley in the head, and he, in turn, punched her in the head. Afterward, Wesley's eye was "a little red." Hanes went to her mother's house after the incident. But she returned to Wesley's house the next day because she could not get along with her mother. After Hanes apologized, Wesley accepted her back into his house but he told her to save her money so she could move out and get her own place.

When Hanes was twenty-three or twenty-four, Wesley and the other children helped her move into her own apartment. Wesley testified that he had a good relationship with Hanes and her husband after she moved out and later married. For the previous few years, the whole family got together for Thanksgiving at the home of Hanes and her husband. When Christmas was at one of the other children's homes, he paid travel expenses for Hanes and her husband so they could attend. Even after she moved away, they spoke on the telephone several times per month.

In October 2019, Hanes recorded a telephone call that she had with Wesley and turned the recording over to the police. Portions of the recording were admitted into evidence at trial

15

and played for the jury. During the phone call, the following relevant conversation occurred between Hanes and Wesley:

> HANES: Daddy, . . . [A]ll of this stuff that's going on, Daddy, . . . it's taking me back. . . .
>
> WESLEY: Takes me back. . . . I want to just . . . kill myself. . . . I can't go there, it was a dark, dark, dark . . . it was terrible.
>
> HANES: Why did you do it? . . . .
>
> WESLEY: . . . it wasn't intentional. . . . I didn't honey. It's crazy. . . .
>
> HANES: . . . . I hear you and, you know, and I hear you, you know, how it's affecting you, but, like, but it happened to me . . . . I carried that for years . . . I couldn't talk to anybody and even when I did nobody believed me and ya'll would tell people that I was lying . . . and I forgave ya'll. I did. That's why I stayed and I still loved you . . . . Everybody wanted [me] to shut up and not say anything, but it's like I need ya'll to hear me because I need closure; I never got closure. . . . I don't want anything bad to happen to you. . . . It wasn't just the rape, it was just it was Cynthia with her lying . . . and ya'll made me an outcast. And I just want to know why.
>
> WESLEY: I didn't make you an outcast. . . . Cynthia really didn't know . . . Cynthia didn't know what happened. I never told Cynthia that. . . .
>
> . . . .
>
> Cynthia asked me and I said 'no,' because how can you say 'yes' to something like that? . . . . It was just something that happened . . . I've been crying . . . . It's embarrassing. I don't even know how it happened . . . I'm not like that. . . . Ain't nobody touched [Parker]. [Parker is] just snowballing this thing. Nobody touched her. . . . This ain't no copout, no excuse . . . I didn't get you until you was twelve . . . I know you was . . . my daughter [but due to visitation] we didn't have that closeness. . . . It was my daughter, but it was like it wasn't my daughter . . . . This is why I have these get-togethers with ya'll . . . I want everybody to have that closeness. . . .
>
> HANES: . . . All this stuff that's going on now, . . . it's serious . . . these people are talking about pressing charges and stuff . . . .

16

WESLEY: . . . [Parker] don't have a leg to stand on . . . None of what [Parker] said is true. I ain't touched [Parker]. Ain't none of that true . . . when it comes down to [Cook], she was a grown woman . . . I had an affair . . . You know how they were. You know how they followed me around like a little puppy. . . . I've learned my lesson, baby. I've learned. . . . when you're young you do things that's not right. . . . you got to carry it the rest of your life. I'm looking through the eyes of young man and messed up. I didn't intend to do my baby like that. . . .

. . . .

HANES: . . . . All this stuff coming out, I've got to relive this stuff.

. . . .

WESLEY: . . . . [I]f [my apology was] not good enough, [Hanes], I am Godly sorry for ever laying a hand on you . . . I'm supposed to be your protector . . . . I didn't intend to do nothing, I didn't intend that . . . . I understand you're a victim, baby. . . . What age are you trying to say that I . . . started messing with you or whatever, I hit you or whatever?

HANES: Dad, I was like 14 . . . 14, 13, something like that. You took my virginity. Yes, you did. Dad . . . I was a virgin when this first start happening . . . . How many times did you do that to me? Do you remember? I remember.

WESLEY: No, no, no, no, no. It wasn't as many as you trying . . . .

HANES: It was. It was as many.

. . . .

WESLEY: . . . . One time was too many . . . I shouldn't have never done that . . . . it was just something that happened . . . my job was to protect you and I didn't, I failed. . . . You ever had a test that you were supposed to ace . . . and you failed it? That's what I do . . . . I messed up, I messed up. I'm Godly sorry. I done nothing like that since that time. That's been years ago. I mean, come on.

HANES: . . . [W]hat's the worst that can happen behind all of this?

WESLEY: Me spend the rest of my life in prison, what do you think? That's the worst thing. . . .

. . . .

17

WESLEY: . . . . I was young and made a stupid mistake. Who hadn't been young and made a stupid mistake? And I mean really, really stupid. . . . I did that. I just want ya'll to understand I need God's mercy on me. Have mercy, have mercy on me.

On cross-examination, the State asked Wesley about the contents and subject of the call. Wesley claimed that he had two or three phone calls with Hanes that day, that one call was "to get the menu [for] what [they] were going to have for Thanksgiving at her place," that one call included her asking for $7,000.00 to help pay her bills, and that the recording played for the jury had been edited and tampered with to include statements from those other conversations. He testified that the recording was "cut up" and that the references to Hanes's virginity were then "put in." Wesley testified that his apologies, her question of "how many times," and his statement that "one time was too many" were references to hitting her when she was a teen. He maintained that Hanes's aunt and uncle were "beating on her" when she lived with them and that is what he had failed to protect her from. Wesley did not remember making several of the statements in the recording, including "one time was too many," "I was looking through the eyes of a young man and messed up," and "when you're young, you do things that's not right."

In response to the testimony elicited by Wesley's witnesses, the State called rebuttal witnesses Tisha and Venus. Tisha testified that she was Wesley's niece and that, for a time, Wesley had lived with her mother, stepfather, and brother in Texarkana, Arkansas. She testified that Wesley sexually abused her "[t]hroughout [her] childhood." He would come into her bedroom and have intercourse with her. The abuse started when she was about five years old,

18

and she remembered a nurse giving her a vaginal examination after her mother and grandmother claimed someone was molesting her.

Tisha testified that, about a year before trial, after the allegations against Wesley were made public, Wesley held a meeting at the church with "maybe about ten" people in attendance, including Wesley, Tisha, and Wesley's wife, stepdaughter, and son. At that meeting, Wesley denied abusing Parker and Cook, but he admitted to having abused both Hanes and Tisha. He said that he was a teenager when he abused Tisha; therefore, she could not have been older than five years of age. Until that point, she had never told anyone that he had abused her.

Venus testified that, when she was seventeen and still in high school, Wesley, as her pastor, came to her house to counsel her about some problems she was having. Afterwards, she and Wesley began a consensual, ongoing sexual relationship that was "on and off for years." Wesley admitted to having a sexual relationship with Venus, but he claimed that it did not begin until she was eighteen or nineteen years old. Venus testified that he told her not to tell anyone because "he would go to jail." In her statement to the police, Venus stated that, while she was still seventeen, she became pregnant with Wesley's child, and he drove her to Shreveport where he paid for her abortion procedure. She never told anyone about the abuse. Although Venus married another man two or three years later, she and Wesley continued to have an "off and on" sexual relationship. Her husband eventually confronted Wesley and told him to leave his wife alone, and Wesley got angry and chased him down the road with a stick, a claim that Wesley denied.

19

At the conclusion of the evidence, the trial court denied Wesley's renewed motion for a directed verdict, and the trial court charged and instructed the jury regarding each of the charges against Wesley. The application paragraphs of the trial court's charges tracked the language of the three indictments.[6] As to Hanes, the jury found Wesley guilty of three counts of aggravated sexual assault of a child under fourteen years of age, three counts of sexual assault of a child, and one count of indecency with a child by contact. The trial court sentenced Wesley to life in prison for each of the aggravated assaults and twenty years for each of the remaining four counts. As to Cook, the jury found Wesley guilty of two counts of aggravated sexual assault of a child under fourteen years of age and five counts of sexual assault of a child under the age of seventeen, and the court sentenced him to life in prison for each of the aggravated sexual assaults and twenty years in prison for each of the remaining five counts. As to Parker, the jury found Wesley guilty of indecency with a child by contact and sexual assault of a child, and the court sentenced him to twenty years in prison for each count. The sentences from all three cases were to run consecutively. Wesley appeals here from the seven convictions regarding victim Hanes.

## II.     Specific Unanimity Instruction

In his first point of error, Wesley contends that the trial court's failure to include a specific unanimity instruction requiring the jury to unanimously agree on what specific conduct constituted each specific count caused egregious harm.

---

[6]The indictment regarding victim Parker originally contained four charges, but at the conclusion of the State's case-in-chief, the State abandoned two of the counts, leaving only one count of indecency with a child by contact and one count of sexual assault of a child.

### A.  Standard of Review

"We employ a two-step process in our review of alleged jury charge error."  *Murrieta v.*

*State*, 578 S.W.3d 552, 554 (Tex. App.—Texarkana 2019, no pet.) (citing *Abdnor v. State*, 871

S.W.2d 726, 731 (Tex. Crim. App. 1994)).  "Initially, we determine whether error occurred and

then evaluate whether sufficient harm resulted from the error to require reversal."  *Id.* (quoting

*Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.) (citing *Abdnor*, 871

S.W.2d at 731–32)).

"[T]he jury is the exclusive judge of the facts, but it is bound to receive the law from the

court and be governed thereby."  *Id.* (quoting TEX. CODE CRIM. PROC. ANN. art. 36.13).  "A trial

court must submit a charge setting forth the 'law applicable to the case.'"  *Id.* (quoting *Lee v.*

*State*, 415 S.W.3d 915, 917 (Tex. App.—Texarkana 2013, pet. ref'd) (quoting TEX. CODE CRIM.

PROC. ANN. art. 36.14).  "The purpose of the jury charge . . . is to inform the jury of the

applicable law and guide them in its application.  It is not the function of the charge merely to

avoid misleading or confusing the jury:  it is the function of the charge to lead and prevent

confusion."  *Id.* (quoting *Lee*, 415 S.W.3d at 917 (quoting *Delgado v. State*, 235 S.W.3d 244,

249 (Tex. Crim. App. 2007))).

### B.  The Jury Charge

As to Hanes, (1) counts one and two of the indictment alleged aggravated sexual assault

of a child younger than fourteen years of age by penetrating her sexual organ with Wesley's

finger; (2) count three alleged aggravated sexual assault of a child younger than fourteen years of

age by penetrating her sexual organ with his sexual organ; (3) count four alleged sexual assault

21

of a child under the age of seventeen by penetrating her sexual organ with his sexual organ; (4) count five alleged sexual assault of a child under the age of seventeen by penetrating her anus with his finger; (5) count six alleged sexual assault of a child under the age of seventeen by penetrating her sexual organ with his finger; and (6) count seven alleged indecency with a child by contacting her breast with his mouth. The application paragraphs of the trial court's charges tracked the language of the indictment, but the only mention of unanimity is made in the closing paragraph of the charge, stating, "Your verdict must be unanimous, and when reached, you will notify the bailiff in the manner instructed and the Court will send for you and your verdict will be received in open court."

"Texas law requires that a jury reach a unanimous verdict about the specific crime that the defendant committed." *Cosio v. State*, 353 S.W.3d 766, 771 (Tex. Crim. App. 2011). "This means that the jury must 'agree upon a single and discrete incident that would constitute the commission of the offense alleged.'" *Id.* (quoting *Stuhler v. State*, 218 S.W.3d 706, 717 (Tex. Crim. App. 2007)). "[N]on-unanimity may occur when the State charges one offense and presents evidence that the defendant committed the charged offense on multiple but separate occasions." *Id.* at 772. However, when more than one incident of criminal conduct could be relied on for conviction, a general instruction on unanimity is insufficient. *Arrington v. State*, 451 S.W.3d 834, 841 (Tex. Crim. App. 2015). Because "[e]ach of the multiple incidents individually establishes a different offense or unit of prosecution[,] [t]he judge's charge, to ensure unanimity, would need to instruct the jury that its verdict must be unanimous as to a

22

single offense or unit of prosecution among those presented." *Cosio*, 353 S.W.3d at 772 (footnotes omitted) (citations omitted).

Here, Hanes testified to different instances where Wesley touched her breasts with his mouth, as well as several different instances of digital and genital penetration occurring both before and after she was fourteen years old. However, Hanes only testified to one instance of digital penetration of her anus. Therefore, with the exception of count five, the jury was presented with evidence of different conduct that could satisfy each of the counts of aggravated sexual assault, sexual assault, and indecency by contact.

Neither the State nor Hanes explicitly stated which of the specific instances satisfied which count, and Wesley did not demand that the State make such an election. Thus, with the exception of count five, "[t]he jury could have relied on separate incidents of criminal conduct, which constituted different offenses or separate units of prosecution," in finding Wesley's guilt on a particular charge. *Id.* at 774. Therefore, the trial court was required to instruct the jury that its verdict had to be unanimous as to each single unit of prosecution—counts one through four and counts six and seven. *See id.*; *Arrington*, 451 S.W.3d at 839. But, since the trial court submitted only a general unanimity instruction, "[t]he jury may have believed that it had to be unanimous about the offenses, not the criminal conduct constituting the offenses." *Cosio*, 353 S.W.3d at 774. Because this created the possibility of a non-unanimous verdict, the jury charge was erroneous as to counts one through four and counts six and seven. *See id.*; *Arrington*, 451 S.W.3d at 839.

## C. Harm Analysis

"The level of harm necessary to require reversal due to jury charge error is dependent upon whether the appellant properly objected to the error." *Murrieta*, 578 S.W.3d at 555 (citing *Abdnor*, 871 S.W.2d at 732). "Here, because [Wesley] did not object to the charge, we will not reverse the judgment "unless the record shows the error resulted in egregious harm, *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g), such that he did not receive a fair and impartial trial." *Id.* (citing *Almanza*, 686 S.W.2d at 171; *Loun v. State*, 273 S.W.3d 406, 416 (Tex. App.—Texarkana 2008, no pet.)). "Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Id.* (quoting *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007)). "In making this determination, we review 'the entire jury charge, the state of the evidence, the argument of counsel, and any other relevant information in the record as a whole.'" *Id.* (quoting *Villarreal v. State*, 205 S.W.3d 103, 106 (Tex. App.—Texarkana 2006, pet. dism'd, untimely filed) (citing *Almanza*, 686 S.W.2d at 171)). "Direct evidence of harm is not required to establish egregious harm." *Id.* (citing *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996)).

First, we examine the error in light of the entire jury charge. Here, as found above, the charge "permitted non-unanimous verdicts based on evidence presented in the case." *Tiller v. State*, 578 S.W.3d 143, 148 (Tex. App.—Texarkana 2019, no pet.) (quoting *Arrington*, 451 S.W.3d at 841). The only mention of unanimity in the charge was general, boilerplate language at the end of the charge that stated, "Your verdict must be unanimous, and when reached, you

will notify the bailiff in the manner instructed and the Court will send for you and your verdict will be received in open court." Furthermore, the error affected six of the seven counts on which Wesley was convicted. *See id.* Therefore, a review of the entire charge weighs in favor of finding egregious harm.

There was ample evidence to support the jury's convictions in this case. Hanes's testimony alone was sufficient to support the jury's verdicts on each of the seven counts. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07 (Supp.). Hanes testified that, when she was thirteen years old, Wesley penetrated her vagina with his penis at least once and that he penetrated her vagina with his finger more than once. She also testified that, after she turned fourteen, but while she was still younger than seventeen, Wesley touched her breasts with his mouth, penetrated her vagina with his finger more than once, and penetrated her vagina with his penis on many occassions. The recorded telephone call further supports Hanes's testimony because, despite Wesley's claims that the call was about hitting her when she was a teenager, the jury could have reasonably inferred from the call that Wesley acknowledged, admitted to, and apologized for sexually abusing Hanes. Tisha testified that, during the special meeting at the church, Wesley admitted to having sexually abused Hanes. Even though Hanes did not tell anyone about the abuse for years, Davison and Smith testified that it was not unusual for victims of chronic childhood sexual abuse, such as Hanes, to delay their outcry for years, to be unable to recall specific dates, and to provide fragmented details of the abuse.

Weighing in Wesley's favor was his own testimony, and that of his family members, wholly denying the allegations. Wesley claimed (1) that the recorded telephone call had been

25

edited by someone to include statements from other conversations, (2) that his recorded apologies for failing "to protect" her were about him beating and whipping her as a teen, (3) that he never admitted that he was "going to the penitentiary" for the rest of his life, and (4) that he did not remember (a) saying that he had "messed up" when he was "a young man," (b) saying that he "didn't intend to do it," or (c) that he ended the call by asking Hanes to "have mercy." Wesley's other two daughters, his stepdaughter, and his nephew all testified that, even though they had lived with Wesley and Hanes and spent a significant amount of time with them, they had never seen or heard of Wesley abusing anyone or behaving in an inappropriate sexual manner. Priya testified that, despite spending years sleeping in the same bed and bedroom as Hanes, she never saw or heard Wesley sexually assault Hanes. She believed that Hanes made those allegations up because Wesley refused her frequent requests for money.

Thus, the jury had to choose whether to believe Hanes and the evidence supporting her testimony or Wesley and the evidence supporting his testimony—a "he said, she said" situation. *See Arrington*, 451 S.W.3d at 841. Wesley's theory of the case and his decision to testify "left the jury with an all-or-nothing decision, either he was guilty or he was not." *Id.* at 842. The jury would have acquitted Wesley if they had believed his version of the events. *See id.* at 844. Even so, by finding Wesley guilty of all seven counts, the jury clearly rejected Wesley's defensive theory and the witnesses testifying in support of it. As a result, the state of the evidence "weighs against a finding of egregious harm." *Id.* at 842 (citing *Ruiz v. State*, 272 S.W.3d 819, 826–27 (Tex. App.—Austin 2008, no pet.)); *Cosio*, 353 S.W.3d at 777–78.

Neither party's arguments contributed to or emphasized the charge error by telling the jury that it did not have to be unanimous about the criminal conduct constituting each offense. "The parties also did not ameliorate the error by explaining what was required for a unanimous verdict." *Tiller*, 578 S.W.3d at 149. Accordingly, this factor is neutral. *See Arrington*, 451 S.W.3d at 844.

After reviewing the entire record, we find no other relevant information favoring a finding of egregious harm. Weighing these factors, we overrule this point of error because we are unable to find that the charge error affected the basis of the case, deprived Wesley of a valuable right, or affected a defensive theory. *See Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005).

## III.   The Judgments Should be Modified to Reference the Correct Penal Code Provisions

In his final point of error, Wesley contends that the judgments of conviction fail to state the correct provisions of the Texas Penal Code under which he was convicted.[7] We agree and modify the judgments.

The Texas Rules of Appellate Procedure give this Court authority to modify judgments and correct typographical errors to make the record speak the truth. TEX. R. APP. P. 43.2; *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992); *Battle v. State*, No. 06-07-00148-CR, 2008 WL 482343, at *3 (Tex. App—Texarkana Feb. 25, 2008, no pet.) (mem. op., not designated for publication) (reforming judgment to reflect proper statute under which defendant

---

[7]Wesley also contends that the indictments reference incorrect provisions of the Texas Penal Code, but this Court lacks the power to modify the indictments, and the provisions of the judgments supersede those of the indictments.

should have been convicted); *Gray v. State*, 628 S.W.2d 228, 233 (Tex. App.—Corpus Christi 1982, pet. ref'd).

Wesley was convicted for three counts of aggravated sexual assault of a child under fourteen years of age, an offense found in Section 22.021. That said, the judgments of conviction recite Section 21.021, a nonexistent statute, as the "Statute for Offense." *See* TEX. PENAL CODE ANN. § 22.021. Similarly, Wesley was also convicted on three counts of sexual assault of a child under the age of seventeen, an offense under Section 22.011, but the three judgments of conviction incorrectly list Section 21.011, a nonexistent statute, as the "Statute for Offense." *See* TEX. PENAL CODE ANN. § 22.011 (Supp.). Although Wesley's conviction for indecency with a child by contact also incorrectly lists 21.011 as the "Statute of Offense," the trial court entered a nunc pro tunc judgment where it corrected the error by referencing Section 21.11. *See* TEX. PENAL CODE ANN. § 21.11.

As a result, so that the judgments reflect conviction under the correct statute, we modify the three judgments for aggravated sexual assault of a child under fourteen years of age by replacing Section 21.021 with Section 22.021, and we modify the three judgments for sexual assault of a child under the age of seventeen by replacing Section 21.011 with Section 22.011.

## IV. Conclusion

For these reasons, we affirm the trial court's judgments, as modified.

Scott E. Stevens
Justice

Date Submitted:      March 30, 2021
Date Decided:       December 16, 2021

Do Not Publish