

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-22-00132-CR

JOSHUA DESHAUN LOWE, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 5th District Court
Bowie County, Texas
Trial Court No. 21-F-1014-005

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

## MEMORANDUM OPINION

A Bowie County jury convicted Joshua Deshaun Lowe of (1) capital murder of Caleb,[1] an individual younger than ten years of age,[2] (2) felony murder,[3] and (3) injury to a child fourteen years of age or younger.[4] The trial court sentenced Lowe to the mandatory sentence of imprisonment for life without the possibility of parole on the capital murder conviction.[5] No sentence has been imposed on the remaining convictions.[6] Lowe appeals his conviction for capital murder and asks us to reverse his capital murder conviction because, he argues, convicting him on all three charges violated the prohibition against double jeopardy. Lowe also contends that there was insufficient evidence to establish that he was the actor who killed Caleb and that the jury charge erroneously asked if Lowe caused trauma to Caleb in a manner and means unknown. Finally, Lowe asserts that he was prematurely charged a time payment fee. Because we find that the capital murder conviction should be upheld, that sufficient evidence supports the jury's finding that Lowe killed Caleb, and that the jury charge was not erroneous, we will affirm the trial court's judgment. However, because the time payment fee was premature, we will modify the judgment by deleting the time payment fee.

---

[1]We identify the minor victim and his family members by pseudonyms. *See* TEX. R. APP. P. 9.10.

[2]*See* TEX. PENAL CODE ANN. § 19.03(a)(8) (Supp.).

[3]*See* TEX. PENAL CODE ANN. § 19.02(b)(3).

[4]*See* TEX. PENAL CODE ANN. § 22.04(a)(1) (Supp.).

[5]*See* TEX. PENAL CODE ANN. § 12.31(a)(2).

[6]Because no sentences have been imposed, no judgments have been entered on these charges.

2

**I.      Assuming a Double-Jeopardy Violation, the Capital Murder Conviction Should Be Upheld**

**A.      Procedural Background**

In one indictment, Lowe was charged with capital murder of an individual younger than ten years of age, felony murder, and injury to a child fourteen years of age or younger.  The victim in each case was Caleb.  After the guilt/innocence phase of the trial, the trial court's jury charge allowed the jurors to convict Lowe of each charged offense.  After deliberation, the jury convicted Lowe of each offense.  After he pronounced Lowe guilty of capital murder, the trial court imposed a sentence of imprisonment for life without the possibility of parole.  As to the verdicts for felony murder and injury to a child, the trial court pronounced, "[T]he Court's going to find that those verdicts should be vacated, as they are subsumed by the greater charge of capital murder."  Five days later, the trial court *sua sponte* entered an order that withdrew its oral pronouncement vacating the jury's verdicts on felony murder and injury to a child, reinstated those verdicts, and abated further proceedings on those charges "pending a final mandate from any appeal" of the capital murder conviction and sentence.

**B.      The Double Jeopardy Clause**

"The Double Jeopardy Clause of the Fifth Amendment provides that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.'"  *Illinois v. Vitale*, 447 U.S. 410, 415 (1980), *abrogated on other grounds by United States v. Dixon*, 509 U.S. 688, 704 (1993) (quoting U.S. CONST. amend. V)).  "This constitutional guarantee is applicable to the States through the Due Process Clause of the Fourteenth Amendment."  *Id.* (citing *Benton v. Maryland*, 395 U.S. 784, 794 (1969)).  The Double Jeopardy Clause "has been held to consist of

3

three separate guarantees: (1) 'It protects against a second prosecution for the same offense after acquittal. [(2) I]t protects against a second prosecution for the same offense after conviction. [(3)] And it protects against multiple punishments for the same offense.'" *Id.* (alterations in original) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)). Because Lowe was convicted on all three charges in the same trial, this case implicates the third of those guarantees, the protection against multiple punishments for the same offense.

In Texas, "[t]o determine whether there have been multiple punishments for the same offense, we begin by applying the 'same elements' test set forth in *Blockburger*."[7] *Bien v. State*, 550 S.W.3d 180, 184 (Tex. Crim. App. 2018). "Under that test, two offenses are not the same if 'each provision requires proof of a fact which the other does not.'" *Id.* (quoting *Blockburger*, 284 U.S. at 304). "[W]e look to the pleadings to inform the *Blockburger* test." *Id.* (citing *Bigon v. State*, 252 S.W.3d 360, 370 (Tex. Crim. App. 2008)). "If the two offenses have the same elements under the cognate-pleadings approach, then a judicial presumption arises that the offenses are the same for purposes of double jeopardy and the defendant may not be convicted of both offenses." *Id.* (citing *Ex parte Benson*, 459 S.W.3d 67, 72 (Tex. Crim. App. 2015) (orig. proceeding)). "That presumption can be rebutted by a clearly expressed legislative intent to create two separate offenses." *Id.* (citing *Ex parte Benson*, 459 S.W.3d at 72). "Conversely, if the two offenses, as pleaded, have different elements under the *Blockburger* test, the judicial presumption is that the offenses are different for double-jeopardy purposes and multiple punishments may be imposed." *Id.* at 184–85 (citing *Ex parte Benson*, 459 S.W.3d at 72). "This

---

[7]*Blockburger v. United States*, 284 U.S. 299, 304 (1932).

presumption can be rebutted by a showing, through various factors, that the legislature clearly intended only one punishment." *Id.* at 185 (citing *Ex parte Benson*, 459 S.W.3d at 72).

### C. Analysis

Lowe argues that felony murder is a lesser-included offense of capital murder, that injury to a child is a lesser-included offense of felony murder, and that, therefore, the three offenses are legally the same. He also argues that the underlying facts alleged for each offense were the same, as well as the proof at trial. As a result, he concludes, the three offenses are the same for double-jeopardy purposes. Quoting *Harris v. State*, Lowe maintains that "a unanimous finding of guilt on a lesser-included offense necessarily requires a unanimous acquittal on the higher offense."[8] As a result, he asks us to reverse his conviction for capital murder and render judgment in his favor.

The State concedes that, in this case, felony murder may be a lesser-included offense, but points out that the legislature has specifically provided that a person may be convicted and sentenced under both the injury to a child statute and another section of the Texas Penal Code.[9] It maintains that, if any double-jeopardy violation occurred, the capital murder conviction should stand.

---

[8]*Harris v. State*, 287 S.W.3d 785, 790–91 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (en banc), *abrogated on other grounds by Barrios v. State*, 283 S.W.3d 348 (Tex. Crim. App. 2009), *abrogated on other grounds by Sandoval v. State*, 665 S.W.3d 496 (Tex. Crim. App. 2022). Lowe also cites *Green v. United States*, 355 U.S. 184, 190 (1957), in support of this proposition.

[9]*See* TEX. PENAL CODE ANN. § 22.04(h) (Supp.) ("A person who is subject to prosecution under both this section and another section of this code may be prosecuted under either or both sections. . . . If a criminal episode is prosecuted under both this section and another section of this code and sentences are assessed for convictions under both sections, the sentences shall run concurrently.").

We need not decide whether those three offenses are the same for double-jeopardy purposes because even assuming, without deciding, that the three offenses are the same for double-jeopardy purposes, in this case, the remedy would be to retain the most serious offense, i.e., "the offense of conviction for which the 'greatest sentence was assessed.'" *Bien*, 550 S.W.3d at 188 (quoting *Ex parte Cavazos*, 203 S.W.3d 333, 338 (Tex. Crim. App. 2006)).

In *Harris*, the defendant was charged with manslaughter with a deadly weapon, and the lesser-included offense of criminally negligent homicide was submitted to the jury as an alternative to the greater offense. *Harris*, 287 S.W.3d at 786. In that type of case, i.e., where only the greater offense is charged and "the lesser offenses are unindicted and can only be submitted to the jury as alternatives to the greater offense," Articles 37.08[10] and 37.14[11] of the Texas Code of Criminal Procedure "address the relationship between a prosecuted greater offense, lesser offenses, and the jury's verdict." *Landers v. State*, 957 S.W.2d 558, 559 n.5 (Tex. Crim. App. 1997), *overruled in part on other grounds by Ex parte Cavazos*, 203 S.W.3d 333, 338 (Tex. Crim. App. 2006). In those cases, the Texas Court of Criminal Appeals, in considering Article 37.08 of the Texas Code of Criminal Procedure, has determined that "[t]he

---

[10]Article 37.08 provides, "In a prosecution for an offense with lesser included offenses, the jury may find the defendant not guilty of the greater offense, but guilty of any lesser included offense." TEX. CODE CRIM. PROC. ANN. art. 37.08.

[11]Article 37.14 provides:

> If a defendant, prosecuted for an offense which includes within it lesser offenses, be convicted of an offense lower than that for which he is indicted, and a new trial be granted him, or the judgment be arrested for any cause other than the want of jurisdiction, the verdict upon the first trial shall be considered an acquittal of the higher offense; but he may, upon a second trial, be convicted of the same offense of which he was before convicted, or any other inferior thereto.

TEX. CODE CRIM. PROC. ANN. art. 37.14.

legislature contemplated that a conviction on a lesser-included offense would necessarily be a verdict of acquittal on the greater offense."[12]  *Sandoval v. State*, 665 S.W.3d 496, 535 (Tex. Crim. App. 2022); *see* TEX. CODE CRIM. PROC. ANN. art. 37.08.

However, when, as in this case, a defendant is indicted and prosecuted on multiple charges, the charges can be submitted separately, and "the rule of acquittal encompassed in" Articles 37.08 and 37.14 does not apply.  *Landers*, 957 S.W.2d at 559 n.5.  In this case, Lowe was indicted and prosecuted on three charges:  (1) capital murder, (2) felony murder, and (3) injury to a child.  As a result, the jury could consider and convict Lowe on each count.[13]  In such a situation, even when a single trial results in convictions of multiple offenses that are considered the same for purposes of double jeopardy, the remedy is to retain the "most serious" offense and to set aside the other convictions.  *Ex parte Cavazos*, 203 S.W.3d 333, 337 (Tex. Crim. App. 2006) (citing *Landers*, 957 S.W.2d at 559–60).[14]  In *Cavazos*, the Texas Court of

---

[12]The United States Supreme Court expressed a similar rule under the Double Jeopardy Clause of the Fifth Amendment in *Green*.  In that case, Green was charged with first-degree murder, but the trial court instructed the jury that it could find him guilty of either first-degree murder or the lesser offense of second-degree murder.  *Green*, 355 U.S. at 185.  The jury found Green guilty of second-degree murder but did not find him guilty of first-degree murder.  *Id.* at 186.  Green's conviction was overturned on appeal, he was retried for first-degree murder, and he was found guilty of that offense.  *Id.*  The Supreme Court reversed the conviction and noted that "it has long been settled under the Fifth Amendment that a verdict of acquittal is final, ending a defendant's jeopardy, and even when 'not followed by any judgment, is a bar to a subsequent prosecution for the same offence.'"  *Id.* at 188 (quoting *United States v. Ball*, 163 U.S. 662, 671 (1896)).  It went on to explain, "When given the choice between finding him guilty of either first or second degree murder[, the jury] chose the latter.  In this situation the great majority of cases in this country have regarded the jury's verdict as an implicit acquittal on the charge of first degree murder."  *Id.* at 190.

[13]"The Supreme Court has directed that when a defendant is convicted in a single criminal action of two offenses that are the 'same' for double jeopardy purposes," double jeopardy requires vacating one of the convictions (and its sentence), but the Court did not specify which one.  *Landers*, 957 S.W.2d at 559 (citing *Ball v. United States*, 470 U.S. 856, 864–65 (1985)).  As a result, "[w]hich conviction to vacate . . . is a question of state law."  *Id.*

[14]As in this case, the defendants in *Bien*, *Ex parte Cavazos*, and *Landers* were charged with multiple offenses that were all tried in a single trial and resulted in multiple convictions.  *Bien*, 550 S.W.3d at 182–83; *Ex parte Cavazos*, 203 S.W.3d at 335; *Landers*, 957 S.W.2d at 558–59.

Criminal Appeals held that "the 'most serious' offense is the offense of conviction for which the greatest sentence was assessed." *Id.* at 338. The court has also recognized that courts have employed a number of "tie-breakers" when the degree of offense and punishment assessed are the same. *Bien*, 550 S.W.3d at 188.

Lowe was assessed life imprisonment without the possibility of parole on his capital murder conviction. Although both felony murder and injury to a child, which in this case are first-degree felonies, could result in possible sentences of life imprisonment,[15] Lowe would be eligible for parole after serving thirty years on those sentences. *See* TEX. GOV'T CODE ANN. § 508.145(d)(1)(A), (d)(2) (Supp.); TEX. CODE CRIM. PROC. ANN. art. 42A.054(a)(2), (10) (Supp.). As a result, Lowe's conviction for capital murder would be retained as the most serious offense, even if felony murder and injury to a child were determined to be the same offense for the purposes of double jeopardy. Because Lowe is not entitled to a reversal of his conviction for capital murder even if there is a double-jeopardy violation, we overrule this issue.

## II. Sufficient Evidence Supports the Jury's Verdict

Lowe also challenges the sufficiency of the evidence to support the jury's finding that he was the actor who killed Caleb. He argues that there was no evidence of how or when Caleb received his injuries, so there was no evidence to establish that he was the actor who killed Caleb. We disagree.

---

[15]*See* TEX. PENAL CODE ANN. § 12.32(a).

### A. The Evidence at Trial

On July 11, 2021, Caleb, his mother, Kayla, his sister, Shawna, and Lowe shared a house with Lennon Davis. Kayla had been dating Lowe for five months, and they had lived together for about three months. On the morning of July 11, Kayla and Davis left the house around 11:00 to go to their jobs. Kayla testified that, before they went to work, Caleb, who was ten months old, was "jolly," in the bedroom playing with toys with Shawna and crawling around. She stated that he seemed normal.

Around 12:30 p.m., Davis received a telephone call at work from Lowe, who told him that Kayla and he should come home because Caleb choked on some meat and was not breathing. Davis and Kayla left immediately, and when they arrived home, Caleb was unresponsive and lying on the bedroom floor. Kayla testified that, when she asked Lowe what happened, he told her that he was in the bathroom and Shawna knocked on the door, then pointed to what was wrong. He told her that Caleb was choking on a hot dog and that, after he got the hot dog out of his throat, he accidentally dropped Caleb on his head. Kayla and Lowe took Caleb to Christus St. Michael Hospital in Davis's van, and according to Kayla, Caleb's skin was cold, and he was unresponsive, had no pulse, was not breathing, and had bruises all over his body.

When they arrived at the hospital, Lowe carried Caleb inside and said that the baby was choking and had stopped breathing on the way to the hospital. Jerrika Weaver, a special investigator for the Texarkana, Texas, Police Department (TTPD), was in the emergency room of St. Michael when they arrived. She testified that Lowe claimed that Caleb had eaten hot dogs

9

and eggs for breakfast and had choked on them while he was in the bathroom. He claimed that Caleb was not breathing for no more than thirty seconds and that he went cross-eyed after Lowe got everything out of his throat. Lowe told her that he had held Caleb to his shoulder and patted his back, that Caleb spat down his shoulder, that he was breathing on the way to the hospital, and that Caleb had just recently stopped breathing. However, Weaver testified that she felt Caleb's back while Lowe held him and that he was very cold. She also testified that he was covered in bruises on his face, chest, arms, and legs. Weaver reported that the baby was deceased because he was lacking in color, was not breathing, was very cold, and had marks all over him.

One of the nurses who attended to Caleb at St. Michael described him as gray, limp, dusky, unresponsive, and lifeless when she first saw him. Another nurse testified that he was cold to the touch, had a distended belly, and had fixated and dilated pupils, which she said usually means the baby is brain dead. Both of them testified that Caleb had bruises around his face, neck, chest, and back in various stages of healing. In the emergency room, Caleb was intubated, given CPR, and got a pulse after several rounds of epinephrine. His rectal temperature was 87.9 degrees, which one nurse opined meant that he had been down a while. She also opined that, if he had just started choking and was brought to the hospital, he would normally have a temperature of 97.6 or above.

Andrew Frost, an emergency medicine physician at St. Michael, testified that, based on the history given by Lowe, Frost expected to find something lodged in Caleb's throat. However, he did not find anything in the throat, so he intubated Caleb to get him breathing. He explained that, when a person is not breathing for a while, his organs begin to fail. The brain is the first to

10

shut down, and the brain cells begin to die. He also explained that the pH level turns acidic. A normal pH level is between 7.35 and 7.45, but Caleb's was 6.82, which was not compatible with life. He also testified that Caleb's temperature was between 85 and 87, which meant that he had been injured for some time. He explained that that could be caused by cardiac arrest and opined that it occurred within a couple of hours.

Frost ordered CT scans to find out what happened to Caleb after he saw numerous healed fractures on a chest x-ray. The CT scans showed that there was bleeding inside the skull, so he knew Caleb needed a neurosurgeon and to be transferred to a hospital with a pediatric intensive care unit (PICU). Joshua Martin, a radiologist at St. Michael, described the CT scans of the head, cervical spine, chest, and belly. He testified that they showed fractures in various stages of healing on the right and left humeri, some of which were older than one week. He also noted fractures in both shoulders and several rib fractures on both the right and left side. Martin testified that the head CT showed blood products along the midline structure that should not be there. He pointed out that it showed both acute blood products that had escaped the vascular in the preceding six hours and chronic blood products that were there at least a week.

Caleb was transferred from St. Michael to Arkansas Children's Hospital in Little Rock. Sateesh Jayappa, a radiologist at ACH, reviewed CT scans and x-rays taken at ACH and the CT scans taken at St. Michael. He testified that the head CT showed a fracture in the skull from the left parietal bone to the right parietal bone across the midline that did not show signs of healing. He opined that it was a recent fracture that had occurred within a week preceding the time of the scan. He also pointed out the subdural hemorrhage in the right cerebral hemisphere that

11

extended across the midline into the left cerebral hemisphere and noted evidence of brain swelling. He classified the hemorrhage as acute, meaning it occurred anywhere within one hour to seven days before the scan. He also identified the fractures to Caleb's right and left humeri, five of his right ribs, his scapula, his right and left wrists, his left ulnar, and the metacarpal bone in his left hand, all of which were in various stages of healing.

Liza Murray, a child abuse pediatrician at ACH, testified that Caleb was unresponsive when he arrived at the hospital and that he never responded to any interventions. A neurosurgeon evaluated Caleb and, due to the extent of the brain injury, determined that there was little they could do to save his life. He was stabilized in PICU, placed on a ventilator, had support to keep his heart beating, and was given medical treatments. On July 13, they tested him for brain death and did a second test at least twelve hours later. Caleb was pronounced dead after the second test.

Murray reviewed all of the medical records to make her final diagnosis, including an ophthalmologist's report that determined Caleb had hemorrhaging thru all the layers of his retina and folds in his retina, which are associated with very severe trauma. She opined that choking on food would not cause a severe brain bleed. Murray opined that Caleb suffered a fatal head trauma. She explained,

> [F]atal head trauma is not something that is known to cause a delay in symptoms or anything similar to a child looking normal after this head injury, so this was a serious, fatal head injury and . . . this child would not have looked or acted normal after this head injury occurred.

She also opined that she would not expect Caleb "to be smiling, looking at people, sitting up on [his] own, [or] eating on [his] own" but, rather, that he "would have been symptomatic

12

immediately after the head injury occurred" and that he would not return to normal after such an injury. She explained that the symptoms after a baby suffers a severe head injury include unresponsiveness, seizing, and not breathing. She also opined that fixed and dilated pupils occur with "very, very severe head trauma" and are "a sign of severe brain injury."

Murray also opined that the severe head injury that Caleb suffered was not something he would have had for hours or days but was something that happened within hours of his presentation at the hospital. She also explained,

> When blood is extending over the surface of the brain, kind of everywhere, that is most often associated with more rotational forces, which is the head kind of moving in a violent manner . . . that can occur with . . . different types of mechanisms. . . . [And] could be with or without impact.

She agreed that the skull fracture may or may not have been associated with the subdural hemorrhaging. Her final diagnosis was child physical abuse and abusive head trauma.

Jill Urban, a forensic pathologist with the Dallas County Medical Examiner's Office, performed an autopsy on Caleb. After describing the numerous injuries that Caleb had suffered, Urban focused on the injuries to his head. She noted hemorrhages under the skin of his face, his forehead, the left side of his head, and his right ear. She also pointed to hemorrhage over the entire surface of the brain. She opined that it was possible for one impact to cause the amount of bleeding in Caleb's brain, if it was hard enough. She explained that such an injury cannot be caused by a toddler falling down or rolling off a bed, but rather is the type seen in a car accident or from an adult striking a baby or striking it against something.

Urban opined that this type of injury could cause vomiting and that a baby suffering this injury would not be acting normally. Rather, it would not be alert, make eye contact, or engage

13

with people and may be lethargic or unconscious. She ruled that Caleb died as a result of blunt force trauma and that it was a homicide.

Brad Thacker, a sergeant with TTPD, and Cliff Harris, a detective with TTPD, interviewed Kayla and Lowe separately at the police station after Caleb was transported to ACH. Initially, Lowe told them that Caleb had not been involved in a car crash and had not suffered any major trauma, but mentioned an incident when Caleb was standing and a puppy knocked him over. Regarding what happened to Caleb, Lowe repeated what he had told Weaver, but added that Shawna had alerted him to Caleb choking and that, after his eyes rolled back, he put him on the bed and tapped his feet.

Thacker testified that, after they confronted him about the brain injuries and broken bones, Lowe told them that he was afraid to tell them, but he set Caleb down and Caleb fell from a sitting position and hit his head on the bottom ledge of a table, then his eyes rolled back. Lowe claimed that he disciplined the children by slapping their palms or the bottom of their feet with a paint stir stick and that he playfully and non-violently punched Caleb. Lowe also claimed that Caleb had fallen off the bed days before the incident. Two days later, Lowe told them in a follow-up interview that he cooked the hot dogs, sat the children down, then went outside, and when he came back in, he found Caleb choking on the bedroom floor.

Kayla testified that, one time, she saw a knot on Caleb's head when she came home from work and asked Lowe about it. He told her that Caleb fell off the bed. She also testified that Davis did not interact with the children on the night of July 10 or the morning of July 11. Kayla also acknowledged that she had sent a text message to Lowe about one week before Caleb's

14

death that read, in part, "[Y]ou hurted [sic] me by throwing our daughter on the ground and whatever else, and she also hurts me for not speaking or pottying like she's supposed to. And it hurts me they've got spots and bruises on them. I'm not about to lose our kids anyway."

## B.    Standard of Review

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.)). "Our rigorous [legal sufficiency] review focuses on the quality of the evidence presented." *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)).

"In our review, we consider 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). "It is not required that each fact 'point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). "Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by

15

circumstantial evidence alone." *Id.* (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015)). "Further, 'we must consider all of the evidence admitted at trial, even if that evidence was improperly admitted.'" *Id.* (quoting *Fowler v. State*, 517 S.W.3d 167, 176 (Tex. App.—Texarkana 2017), *rev'd in part by* 544 S.W.3d 844 (Tex. Crim. App. 2018)).

The jury, as "the sole judge of the credibility of the witnesses and the weight to be given their testimony[, could] 'believe all of [the] witnesses' testimony, portions of it, or none of it.'" *Id.* (second alteration in original) (quoting *Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim. App. 2014)). "We give 'almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility.'" *Id.* (quoting *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008)).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Id.* at 298 (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240). Under the indictment and applicable statutes, to establish that Lowe committed capital murder, the State had to establish, beyond a reasonable doubt, that (1) Lowe (2) intentionally or knowingly (3) caused the death of (4) Caleb, (5) who was under ten years of age. *See* TEX. PENAL CODE ANN. §§ 19.02(b)(1), 19.03(a)(8).

16

## C.    Analysis

Lowe concedes that there was sufficient evidence to establish someone intentionally or knowingly caused the death of Caleb and that Caleb was under ten years of age.[16] Lowe argues, however, that Kayla and Davis also had access to Caleb, all of whom were potential perpetrators. He concedes that there was evidence that he was with Caleb when he stopped breathing but contends that there was insufficient evidence of when Caleb suffered the injuries that caused his death, or what act caused Caleb's death, to establish that he caused Caleb's death.

Kayla's uncontroverted testimony showed that, before she and Davis left for work on the morning of July 11, Caleb was crawling, playing, and acting normally. As Lowe admits, Caleb was in his sole care when he stopped breathing. Kayla and Davis both testified that, when they returned home after the telephone call from Lowe, Caleb was lying on the bedroom floor not breathing and unresponsive. Kayla also testified that Caleb remained unresponsive, not breathing, and with no pulse during their travel to St. Michael. When Caleb arrived at the hospital, he was described by several witnesses as very cold to the touch, not breathing, lacking in color, lifeless, without a pulse, and having fixed and dilated pupils.

At St. Michael and ACH, it was determined that Caleb had received a severe head trauma that caused extensive hemorrhaging over the entire surface of his brain, the retinas of his eyes, and his optic nerves. Murray, the child abuse pediatrician, determined that this indicated that Caleb had suffered a fatal head trauma. Her testimony established that Caleb would have exhibited symptoms immediately after this trauma, including unresponsiveness, seizing, not

---

[16]After a review of the record, we agree that there was sufficient evidence that established these elements beyond a reasonable doubt.

breathing, and fixed and dilated pupils. She also opined that Caleb would not have returned to normal after suffering this injury. Urban, the forensic pathologist, agreed that a baby suffering an injury like Caleb's would not be acting normally. She testified that a baby suffering such an injury would not be alert, make eye contact, or engage with people, and may be lethargic or unconscious. Martin, a radiologist, testified that the acute hemorrhaging in Caleb's brain occurred within six hours of his arrival at St. Michael. Jayappa opined that it occurred anywhere from one hour to seven days before presentment at the hospital.

Murray's and Urban's testimony established that Caleb's severe and persistent symptoms were indicative of a fatal head trauma of some sort. Their testimony established that those symptoms would arise immediately after the injury, and the testimony of Kayla and Davis, as well as Lowe's statements to law enforcement, established that those symptoms arose while Caleb was in Lowe's care. Although the exact timing and mechanism is unknown,[17] the jury in its role of "assessing the credibility of witness testimony and resolving the inconsistencies in the evidence presented at trial," could reasonably infer that the fatal injury to Caleb occurred while he was in the sole care of Lowe. *Ex parte De La Cruz*, 466 S.W.3d 855, 867 (Tex. Crim. App. 2015) (orig. proceeding).

---

[17]Lowe points out that he posited several different ways that Caleb's injuries could have happened in his statements to law enforcement and others and complains that there was no evidence to link those acts to Caleb's death. The different ways included that Caleb choked on a hot dog, that a puppy knocked him over, that Lowe accidentally dropped him, and that he toppled over when Lowe sat him down and hit Caleb's head on a table ledge. We agree that the testimony showed that none of those incidents could have caused the hemorrhaging on Caleb's brain. However, the jury, as the sole judge of Lowe's credibility, was free to disbelieve Lowe's explanations. Further, they could have reasonably concluded that Lowe's inconsistent explanations of what happened to Caleb were an indication that he lied to law enforcement and others in an attempt to conceal what caused Caleb's injuries and that they could have reasonably considered this affirmative evidence of his guilt. *See Padilla v. State*, 326 S.W.3d 195, 201 (Tex. Crim. App. 2010).

18

As our sister court has observed, "Texas case law is replete with holdings that when an adult defendant has had sole access to a child at the time its injuries are sustained, the evidence is sufficient to support a conviction for injury to a child, or murder if the child dies." *Garcia v. State*, 16 S.W.3d 401, 405 (Tex. App.—El Paso 2000, pet. ref'd) (citing *Bryant v. State*, 909 S.W.2d 579, 583 (Tex. App.—Tyler 1995, no pet.); *Elledge v. State*, 890 S.W.2d 843, 846 (Tex. App.—Austin 1994, pet. ref'd); *Butts v. State*, 835 S.W.2d 147, 151 (Tex. App.—Corpus Christi 1992, pet. ref'd)). On this record, we find that sufficient evidence supports the jury's finding that Lowe was the actor who caused Caleb's death. We overrule this issue.

## III. No Jury Charge Error

Lowe also asserts that the trial court erred by including in the application portion of the jury charge two potential ways that he could have committed capital murder. He argues that there was no evidence to support the trial court charging the jury that it could find him guilty if it found that he intentionally or knowingly caused Caleb's death "by causing trauma to [Caleb] by a manner and means unknown." Rather, he argues, all the evidence supported only that Caleb's death was caused "by hitting [Caleb] with or against an unknown object."

### A. Procedural Background

In the first paragraph of its indictment charging Lowe with capital murder, the State alleged that Lowe caused Caleb's death "by <u>hitting [Caleb] with or against an unknown object</u>." In the second paragraph of that charge, the State alleged that Lowe caused Caleb's death "by <u>causing trauma to [Caleb] by a manner and means unknown</u>."

19

After the parties rested and closed in the guilt/innocence phase of the trial, the trial court gave its charge to the jury, which included the following application paragraph:

> Now, if you find from the evidence beyond a reasonable doubt in Count 1 that on or about July 11, 2021, in Bowie County, Texas, the defendant, JOSHUA LOWE, did then and there, intentionally or knowingly cause the death of an individual, namely, [Caleb], by hitting [Caleb] with or against an unknown object or by causing trauma to [Caleb] by a manner and means unknown, and the said [Caleb] was then and there an individual younger than 10 years of age, then you will find the defendant guilty of Capital Murder as charged in count one of the indictment.

## B.    Standard of Review

"We employ a two-step process in our review of alleged jury-charge error." *Murrieta v. State*, 578 S.W.3d 552, 554 (Tex. App.—Texarkana 2019, no pet.) (citing *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994)). "Initially, we determine whether error occurred and then evaluate whether sufficient harm resulted from the error to require reversal." *Id.* (quoting *Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.)).

"[T]he jury is the exclusive judge of the facts, but it is bound to receive the law from the court and be governed thereby." *Id.* (alteration in original) (quoting TEX. CODE CRIM. PROC. ANN. art. 36.13). "A trial court must submit a charge setting forth the 'law applicable to the case.'" *Id.* (quoting *Lee v. State*, 415 S.W.3d 915, 917 (Tex. App.—Texarkana 2013, pet. ref'd)). "The purpose of the jury charge . . . is to inform the jury of the applicable law and guide them in its application. It is not the function of the charge merely to avoid misleading or confusing the jury: it is the function of the charge to lead and prevent confusion." *Id.* (quoting *Lee*, 415 S.W.3d at 917). "The trial judge has an absolute *sua sponte* duty to prepare a jury charge that accurately sets out the law applicable to the specific offense charged." *Oursbourn v.*

20

*State*, 259 S.W.3d 159, 179 (Tex. Crim. App. 2008) (quoting *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007)). As a result, the jury charge should only contain theories that are supported by the evidence at trial. *Moulton v. State*, 395 S.W.3d 804, 810 (Tex. Crim. App. 2013) (citing *Sanchez v. State*, 376 S.W.3d 767, 774 (Tex. Crim. App. 2012)).

"The level of harm necessary to require reversal due to jury charge error is dependent upon whether the appellant properly objected to the error." *Murrieta*, 578 S.W.3d at 555 (citing *Abdnor*, 871 S.W.2d at 732). When, as here, the defendant "did not object to the charge, we will not reverse the judgment unless the record shows the error resulted in egregious harm." *Id.* (citing *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005)). "Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Id.* (quoting *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007)).

### C. Analysis

Lowe argues that all the evidence at trial was that Caleb's death was caused by blunt force trauma and resulted from Caleb being hit by or struck against something and that there was no evidence that he was killed in a manner and means unknown. We agree that Urban testified that Caleb's death was caused by blunt force trauma and that his fatal injuries may have resulted from an adult striking a baby or striking it against something. And we also agree that this testimony supported the instruction of "hitting . . . with or against an unknown object."

However, there was also evidence supporting the "causing trauma by a manner and means unknown" instruction. Murray agreed that Caleb's death was caused by a fatal head

21

trauma. But she explained that, because of the extent of the blood covering the surface of Caleb's brain, this type of trauma was "most often associated with more rotational forces, which is the head kind of moving in a violent manner . . . that can occur with . . . different types of mechanisms . . . [and] could be with or without impact." She also agreed that the skull fracture suffered by Caleb may or may not have been associated with that hemorrhaging. We find that this testimony supported the "causing trauma by a manner and means unknown" instruction. As a result, we find that the trial court did not err in including this theory in the jury charge. We overrule this issue.

## IV.     The Judgment Must Be Modified

Lowe also complains that the trial court prematurely assessed a time payment fee and asks us to modify the judgment and bill of costs by deleting that fee. The State agrees that the assessment of a time payment fee was premature.

The certified bill of costs contains an assessment against Lowe for $290.00 in court costs and $15.00 for a time payment fee. The judgment includes an assessment against Lowe of $290.00 for "Court Costs" and $10.00 for "Reimbursement Fees." Because there is nothing in the certified bill of costs that corresponds with the $10.00 entry for "Reimbursement Fees," we agree with Lowe that that amount represents an assessment of a time payment fee.

The Texas Court of Criminal Appeals has recently concluded that a time payment fee like the one imposed here "must indeed be struck for being prematurely assessed because a defendant's appeal suspends the duty to pay court costs and therefore suspends the running of the clock for the purposes of the time payment fee." *Dulin v. State*, 620 S.W.3d 129, 129 (Tex.

22

Crim. App. 2021). "As a consequence, even now, assessment of the time payment fee in this case would be premature because appellate proceedings are still pending." *Id.* Pursuant to *Dulin*, we strike the time payment fee "in [its] entirety, without prejudice to [it] being assessed later if, more than 30 days after the issuance of the appellate mandate, the defendant has failed to completely pay any fine, court costs, or restitution" owed. *Id.* at 133. We will modify the judgment by deleting the $10.00 for "Reimbursement Fees," and we will modify the bill of costs by deleting the time payment fee.

## V. Conclusion

We modify the judgment by deleting the $10.00 for "Reimbursement Fees," and we modify the bill of costs by deleting the time payment fee. As modified, we affirm the trial court's judgment.

Scott E. Stevens
Chief Justice

Date Submitted:     August 31, 2023
Date Decided:      September 22, 2023

Do Not Publish